

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-20-2002

# USA v. 422.57 US Curr

Precedential or Non-Precedential: Precedential

Docket No. 00-4348

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"USA v. 422.57 US Curr" (2002). *2002 Decisions.* Paper 592.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/592

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed September 20, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-4348

UNITED STATES OF AMERICA

v.

NINETY-TWO THOUSAND FOUR HUNDRED TWENTY-TWO
DOLLARS AND FIFTY-SEVEN CENTS ($92,422.57),
UNITED STATES CURRENCY SEIZED FROM PNC BANK
ACCOUNT #8400369727 HELD IN THE NAME OF KIM'S
WHOLESALE DISTRIBUTORS, INC.

KIM'S WHOLESALE DISTRIBUTORS, INC.,

　　　Appellant

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
(Dist. Court No. 00-cv-03548)
District Court Judge: Stewart Dalzell

Argued December 6, 2001

Before: ALITO, AMBRO, and GREENBERG, Circuit  Judges.

(Opinion Filed: September 20, 2002)

David M. Howard
Stephen J. McConnell (Argued)
Dechert, Price and Rhoads
4000 Bell Atlantic Tower
1717 Arch Street
Philadelphia, PA 19103-2793

Catherine M. Recker
Welsh & Recker
2000 Market Street
Suite 2903
Philadelphia, PA 19103
Counsel for Appellant

Michael L. Levy
Robert A. Zauzmer
Christopher R. Hall (Argued)
Office of United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106
Counsel for Appellee

OPINION OF THE COURT

ALITO, Circuit Judge:

This is an appeal from a judgment of civil forfeiture for
funds from a bank account owned by Kim's Wholesale
Distributors, Inc. ("Kim's"). The complaint claimed that the
funds were subject to forfeiture under 18 U.S.C.
S 981(a)(1)(A) on the ground that they had been involved in
transactions in violation of the money laundering statute,
18 U.S.C. S 1956. Proof supporting the forfeiture was
obtained from business records seized from Kim's pursuant
to a warrant issued by a United States Magistrate Judge in
connection with a wide-scale investigation of illegal
trafficking in food stamps.

Kim's moved to suppress the evidence under the Fourth
Amendment1 and to dismiss the complaint. When the

_____

1. In One 1958 Plymouth Sedan v. Pennsylvania , 380 U.S. 693, 700
(1965), the Supreme Court held that the Fourth Amendment's

2

District Court denied those motions, the parties entered
into a stipulation under which Kim's conceded that it had
no defense to the forfeiture action, final judgment was
entered against Kim's in the amount of $92,422.57, and
Kim's retained the right to appeal the District Court's ruling
on its motion to suppress and dismiss. The District Court
entered judgment against Kim's in the amount of
$92,422.57, and this appeal followed.2  For the reasons
stated below, we reject Kim's arguments relating to
probable cause and particularity, but we find the record
inadequate to resolve Kim's argument concerning the
seizure of documents written in Chinese, and we therefore
vacate the judgment and remand for further proceedings
regarding that issue.

I.

In October 1996, the government received anonymous
letters implicating two individuals, Qiang Wang and Qun
Chen, in an elaborate food stamp trafficking scheme.
According to the letters, Chinese take-out restaurants were
buying food stamps from low-income food stamp recipients
for seventy cents on the dollar. JA at 107. It was alleged
that the restaurants were then reselling the food stamps to
a partnership (the "Wang-Chen Partnership") for ninety
cents on the dollar. The partnership, in turn, was allegedly

_____

exclusionary rule applies to forfeiture cases because "a forfeiture
proceeding is quasi-criminal in character." However, in recent years, the
Supreme Court has declined to extend the exclusionary rule to a variety
of non-criminal proceedings. See e.g., Pennsylvania Bd. of Prob. and
Parole v. Scott, 524 U.S. 357, 369 (1998)(a parole board may consider
evidence obtained in violation of the Fourth Amendment when making a

recommittal determination); Immigration and Naturalization Serv. v. Lopez-Mendoza, 468 U.S. 1032, 1050-51 (1984)(declining to apply the exclusionary rule to civil deportation hearings held by the INS); United States v. Janis, 428 U.S. 433, 447 (1976)(refusing to apply the exclusionary rule to federal civil tax proceedings). In this case, the government does not contest the applicability of One 1958 Plymouth Sedan.

2. Here, unlike in Verzilli v. Flexon, Inc. , 295 F.3d 421 (3d Cir. 2002), we have appellate jurisdiction because reversal would not result in a "full trial." Id. at 425.

redeeming the food stamps through grocery stores that did little if any legitimate business. Id. The partnership allegedly opened stores, operated them for a time, and then closed them to avoid paying taxes. Id. The letters named three stores, Wyoming Variety Store, Tasker Grocery Store, and Jacky's Food, that they claimed were operating solely for the purpose of trafficking food stamps. Id .

After receiving the letters, the Secret Service and Department of Agriculture began an extensive investigation. In the spring of 1997, "undercover Secret Service agents sold more than $130,000 in food stamps" to the members of the Wang-Chen Partnership for sixty cents on the dollar.3 Id. at 106. Those food stamps were later redeemed through Wyoming Variety, one of the three stores named in the letter, and two others, Gou Bao Grocery and Hing Loong

_____

3. For example, on March 11, 1997, a confidential informant sold Wang "$3,030 in food stamps for $2,100 in cash." JA at 120. After the sale, Government agents watched Wang walk to a Chinese restaurant with the stamps purchased from the informant. Wang then went to another Chinese restaurant and to Hing Loong Food Market. A few days later, an agent retrieved food stamp book covers from the $3,030 in food stamps sold to Wang from the garbage receptacle outside Hing Loong Food Market. The stamps had cancellation markings from Hing Loong Food Market.

On March 18, 1997, the confidential informant introduced Wang to Secret Service Agent Chan. Agent Chan indicated that he sold bulk quantities of food stamps for cash. During this contact, "Wang told Agent Chan that he had seven grocery stores through which he redeemed food stamps and that he and his partners had already redeemed over one million dollars worth [of food stamps]." Id. at 121. Wang further stated that he could "take up to $100,000 in food stamps at one time." Id. Wang gave Agent Chan $18,000 in cash for $30,000 in food stamps, which were then redeemed by Hing Loong Food Market and Wyoming Variety. Id. at 121-22.

On April 4, 1997, Wang called the confidential informant and told him that he had six individuals who would like to buy any amount of food stamps that Agent Chan could obtain. Id. at 122. On May 8, 1997, another Secret Service agent posed as an associate of Chan's and met with Wang to sell him $100,000 in food stamps for $60,000 in cash. Id. During this meeting, Wang told the agent that he would redeem $70,000

of the $100,000 in food stamps through his businesses and would resell the $30,000 balance to other parties. Id. at 123.

Food Market and Trading, Inc. Id. A sixth store, Zheng's Grocery, was later identified. Id. at 108. A review of the bank records of five of these six stores revealed that they had "collectively redeemed over $12,000,000 in food stamps since April 1994." Id.

The investigation yielded substantial evidence that these stores did "little if any legitimate retail food business." Id. at 109. Agents videotaped customer traffic in and out of Gao Bao Grocery and found that on average only eight customers a day left with a bag. The store received few deliveries: a man "carried two to three plastic grocery bags into the store on approximately twenty-one occasions between January and April 1997." Id. at 137. Yet Gao Bao deposited $1,885,205 in food stamps between September 23, 1996, and May 31, 1997. Id. at 138. The store would have had "to turn over a $5,000 inventory ten times a week to generate these sales." Id. Wyoming Variety, which had no cash register and was sparsely stocked with a small supply of canned foods and beverages, nevertheless redeemed "$308,359 a month on average" in food stamp deposits. Id. at 140-41. A mail carrier who delivered mail around noon to Jacky's Grocery reported that the store was closed 85% of the time; nevertheless, between March 6, 1995, and March 28, 1996, Jacky's "deposited $2,735,573 in food stamps," which "accounted for 99% of all [its] business receipts." Id. at 147-48.

Tasker Grocery's mail carrier reported that "the door was always locked . . . . There were never any customers." Id. at 150. But Tasker Grocery redeemed $2,004,164 in food stamps between April 1, 1994, and March 22, 1995. Id. Food stamps accounted for 99% of all its deposits. Id.

Officers videotaped Zheng's Grocery between May 13 and May 16, 1996. The videotape disclosed an employee enter the store at about 8:30 a.m. and lock the door behind him. People who tried to enter the store were unable to do so. The employee left at 4:30 p.m. and locked the door behind him. There were no deliveries. Id. at 152. However, between December 26, 1995, and October 18, 1996, Zheng's redeemed $2,383,296 in food stamps. Id. Zheng's deposited only $900 in cash during this entire period. Id.  at 153.

The investigation also produced evidence that the sham store owners withdrew food stamp proceeds from their bank accounts by checks made payable either to cash, to the store owners, to an employee of a take-out restaurant, or to one of a group of wholesale food companies -- including Kim's. Id. at 109, 161. Indeed, all of the sham grocery stores "drafted a substantial number of checks to Kim's

despite the fact that the stores were selling little if any food inventory." Id. at 161. For example, Zheng's Grocery drafted $951,603 in checks to Kim's and Wyoming Variety drafted $46,503 in checks to Kim's despite doing little legitimate business. Id. at 162. After reviewing canceled checks drafted by sham grocery stores to Kim's, an agent determined that Kim's had deposited $399,389.20 from these sources into its account at PNC Bank since September 11, 1996. Id. at 164.

The sham grocery store owners drafted checks to Kim's in a manner designed to conceal the proceeds of the food stamp trafficking scheme and make it appear that the stores were purchasing significant food inventory. According to the investigating agents, food stamp traffickers mistakenly believe that checks for more than $10,000 result in the filing of a Currency Transaction Report or a Suspicious Activity Report,[4] id. at 118, and the vast majority of the checks drafted to Kim's by Gou Bao Grocery and Zheng's Grocery were in amounts just below $10,000. Id. 163, 164. Zheng's Grocery often drafted more than one check a day to Kim's. For example, on July 1, 1996, Zheng's drafted four checks to Kim's in the following amounts: $9,400, $9,300; $9,200, and $9,100. Id. at 163. Gou Bao wrote checks for just under $10,000 several times a week. Id. at 164.

Two lead case agents -- Senior Special Agent Debra Thomerson, from the Department of Agriculture, and Special Agent Glen McElravy, from the Secret Service-- swore out an affidavit in support of a master search warrant for numerous locations, including Kim's. Agent Thomerson had been involved in over 100 investigations

---

4. In fact, only cash transactions result in the filing of such reports. 31 U.S.C. S 5313 (2000); 31 C.F.R. S 103.22 (2001).

6

involving the illegal use of food stamps, had received special training in the area of food stamp trafficking, and was a specialist in the documentation, identification, and retrieval of food stamps. Special Agent McElravy had assisted in numerous money laundering investigations and had received special training in identifying assets subject to forfeiture due to involvement in money laundering offenses. The affidavit underlying the search warrant set forth facts to show that Kim's was a participant in an ongoing and extensive scheme to traffic in food stamps, in violation of 7 U.S.C. SS 2024 (b) and (c) (food stamp fraud), 18 U.S.C. S 1956 (money laundering), 18 U.S.C. S 1956 (h) (money laundering conspiracy), and 18 U.S.C. S 371 (conspiracy). The warrant application was presented to and signed by a Magistrate Judge on September 11, 1997. The warrant authorized the seizure of the following Kim's records:

     1. Receipts, invoices, lists of business associates, delivery schedules, ledgers, financial statements,

cash receipt, disbursement, and sales journals, and correspondence.

2. Computers, computer peripherals, related instruction manuals and notes, and software in order to conduct an off-site search for electronic copies of the items listed above.

Id. at 181.

When the warrant was executed, numerous documents were seized from Kim's premises, including handwritten notes on brown paper bags recording food stamp transactions, invoices to Chinese restaurants documenting the exchange of food stamps for Kim's products at a discount to face value, and an accounting journal cataloging bulk food stamp transactions. Two journals volunteered by an employee revealed bulk food stamp transactions and documented that Kim's bought food stamps at a discount to face value from at least 19 restaurants in return for wholesale food products, that Kim's redeemed the food stamps through three grocery stores, and that Kim's deposited checks from the grocery stores into its bank accounts. See id. at 187-188. Kim's then sold the illegally obtained food stamps for 90-92 cents

7

to the Wang-Chen Partnership's sham grocery stores, and the sham grocery stores paid with checks drawn on the stores' bank accounts. Id. at 35.

II.

A.

Kim's argues that the District Court erred in refusing to suppress evidence obtained in the search of its premises because the warrant was not supported by probable cause and did not particularly describe the items to be seized. The government counters that the warrant was supported by probable cause and that, in any event, the "good faith" exception to the exclusionary rule, adopted in United States v. Leon, 468 U.S. 897 (1984), applies. Under Leon, if a motion to suppress evidence obtained pursuant to a warrant does not present a Fourth Amendment argument that should be decided in order to provide instruction to law enforcement or to magistrate judges, it is appropriate for a reviewing court to turn "immediately to a consideration of the officers' good faith." Id. at 925. In this case, we do not think that Kim's probable cause and particularity arguments "involve . . . 'novel question[s] of law whose resolution is necessary to guide future action by law enforcement officers and magistrates,' " United States v. Satterwhite, 980 F.2d 317, 320 (5th Cir. 1992) quoting Illinois v. Gates, 462 U.S. 213, 264 (1983), and we therefore turn directly to the good faith issue. See, e.g ., United States v. Taylor, 119 F.3d 625, 629 (8th Cir. 1997); United States v. Zayas-Diaz, 95 F.3d 105, 112 (1st Cir. 1996); United

States v. Cancelmo, 64 F.3d 804, 807 (2d Cir. 1995); Satterwhite, 980 F.2d at 320.

B.

Under Leon, suppression of evidence "is inappropriate when an officer executes a search in objectively reasonable reliance on a warrant's authority." United States v. Williams, 3 F.3d 69, 74 (3d Cir. 1993). The Supreme Court developed the exclusionary rule to deter unlawful police conduct. Leon, 468 U.S. at 906. However, where law

enforcement officers act in the "objectively reasonable belief that their conduct d[oes] not violate the Fourth Amendment," "the marginal or nonexistent [deterrent] benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion." Id. at 918, 922. Therefore, if an officer has obtained a warrant and executed it in good faith, "there is no police illegality and thus nothing to deter." Id. at 921.

To determine the applicability of the good faith exception to the exclusionary rule, we ask "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." United States v. Loy, 191 F.3d 360, 367 (3d Cir. 1999) quoting Leon, 468 U.S. at 922 n.23. The fact that an officer executes a search pursuant to a warrant typically "suffices to prove that an officer conducted a search in good faith and justifies application of the good faith exception." United States v. Hodge, 246 F.3d 301, 308 (3d Cir. 2001) citing Leon, 468 U.S. at 922. Nevertheless, we have identified four narrow situations in which an officer's reliance on a warrant is not reasonable:

> (1) when the magistrate judge issued the warrant in reliance on a deliberately or recklessly false affidavit;

> (2) when the magistrate judge abandoned his judicial role and failed to perform his neutral and detached function;

> (3) when the warrant was based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable;" or

> (4) when the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized.

Id. quoting Williams, 3 F.3d at 74 n.4 (citation omitted).

In the present case, Kim's does not contend that the affidavit contained deliberately or recklessly false information or that the Magistrate Judge abandoned her judicial role. Instead, Kim's relies on the third and fourth

exceptions noted above and maintains that the affidavit was

so lacking in indicia of probable cause and so lacking in the
requisite particularity as to render official belief in the
warrant's legality entirely unreasonable. In order to come
within these exceptions, Kim's must show, not just that the
Magistrate Judge erred in issuing the search warrant at
issue, but that the Magistrate Judge's error was so obvious
that a law enforcement officer, without legal training,
should have realized, upon reading the warrant, that it was
invalid and should thus have declined to execute it.

III.

A.

Kim's contends that the affidavit was so lacking in indicia
of probable cause that the officers who executed the
warrant should have realized that it was invalid.
Specifically, Kim's asserts that "[a]lthough the affidavit to
support the search warrant application was detailed with
respect to the alleged scheme by the grocery stores and the
Chinese restaurants to fraudulently redeem food stamps, it
provided almost no information linking those activities to
Kim's." Appellant's Brief at 35-35. Kim's also contends that
even if the officers could have reasonably thought that the
information in the affidavit provided probable cause that
Kim's premises once contained evidence of the illegal
scheme, any reasonable officer should have realized that
the information was stale by the time the warrant was
issued.

A magistrate judge may find probable cause when,
viewing the totality of the circumstances, "there is a fair
probability that . . . evidence of a crime will be found in a
particular place." Gates, 462 U.S. at 238. When a warrant
is issued and later challenged, a deferential standard of
review is applied in determining whether the magistrate
judge's probable cause decision was erroneous. The
reviewing court inquires whether there was "a 'substantial
basis' for finding probable cause," Hodge, 246 F.3d at 305
quoting United States v. Jones, 994 F.2d 1051, 1054 (3d
Cir. 1993), as "after-the-fact scrutiny by courts of the
sufficiency of an affidavit should not take the form of de

novo review." Gates, 462 U.S. at 236. "[T]he resolution of
doubtful or marginal cases in this area should be largely
determined by the preference to be accorded to warrants."
Jones, 994 F.2d at 1057-58, quoting United States v.
Ventresca, 380 U.S. 102, 109 (1965).

B.

We are not persuaded that the affidavit in this case was

so deficient in probable cause as to render reliance on it unreasonable. On the contrary, we view the affidavit as making a substantial showing of probable cause on which it was objectively reasonable for the officers to rely. See Hodge, 246 F.3d at 309 citing Williams, 3 F.3d at 74. The affidavit provided great detail regarding a complex food stamp fraud and money laundering scheme that had been extensively investigated by experienced officers. Specifically, the affidavit provided information that the Wang-Chen Partnership was engaged in a multi-million dollar scheme under which the Partnership purchased food stamps at a discount and redeemed them through " 'bogus' grocery stores." JA at 107. As noted, undercover agents sold food stamps to the Wang-Chen Partnership, and these stamps were later redeemed by some of these groceries. The investigation showed that these stores did little legitimate business, but a review of the bank records of five of the stores demonstrated that they had collectively redeemed more than $12,000,000 in food stamps since April 1994. Id. at 108. The proceeds from the redemption of the food stamps were withdrawn from the grocery stores' bank accounts by check, and all of "the grocery stores. . . made checks payable to a common set of wholesale food companies," including Kim's. Id. at 109, 161. The amount of the checks "far exceeded the value of any food inventory that the stores may have purchased." Id. at 109.

The affidavit stated that Kim's received $1,305,302 in payments from these "sham" grocery stores. Id. at 162. These payments could not have been payments for groceries because, as the affidavit clearly sets forth, these stores sold few if any groceries. Therefore, the simple fact that Kim's cashed checks from grocery stores implicated in the food stamp trafficking scheme is strong evidence that

11

Kim's was also involved in the scheme. It is therefore apparent that the affidavit "was not a 'bare bones' document" and that the officers' reliance on the search warrant was objectively reasonable. Loy, 191 F.3d at 369.

C.

In arguing that the affidavit in this case was woefully lacking in indicia of probable cause, Kim's places great weight on the following passage in the affidavit:

> [W]holesale food companies that are engaged in food stamp trafficking and money laundering . . . maintain records of their legitimate business activity both at their commercial locations and at private residences to which they have access. These records include receipts, invoices, lists of business associates, records of telephone numbers, delivery schedules, ledgers, financial statements, cash receipt, disbursement, and sales journals, and correspondence. This information is relevant because it shows the extent to which the businesses have been engaged in legitimate commerce.

JA at 119 (emphasis added).

Pointing to this passage, Kim's argues that the"affidavit demonstrate[s] that the government was seeking evidence of legitimate business, . . . [and] a search warrant should only issue when there is probable cause to believe that .. . evidence of a crime will be found in a particular place." Appellant's Brief at 26 (italics in original). This argument is unpersuasive.

As previously stated, the affidavit provided substantial reason to believe that Kim's had received large amounts of money from grocery stores that conducted little or no business. This information provided probable cause to believe that Kim's ordinary books and records would not contain entries showing legitimate grocery purchases by and deliveries to these sham stores, and the absence of such entries would tend to show that the checks issued by these stores to Kim's were for other than legitimate purposes. We therefore see no problem with this passage in the affidavit, and we hold that there is no ground for

12

suppressing the fruits of the search of Kim's premises due to lack of probable cause.

D.

Kim's next argues that suppression is called for because the information in the affidavit relating to Kim's was stale. The search warrant was executed on September 11, 1997, and the affidavit showed that Kim's began a relationship with the Wang-Chen Partnership in 1994 and continued to engage in financial transactions with the Partnership through October 25, 1996. JA at 108-09, 162-64. We reject the argument that this 11-month gap rendered the information in the affidavit so clearly stale that reasonable officers could not have believed that the warrant was valid.

Where "an activity is of a protracted and continuous nature, 'the passage of time becomes less significant.' " United States v. Tehfe, 722 F.2d 1114, 1119 (3d Cir. 1983) quoting United States v. Johnson, 461 F.2d 285, 287 (10th Cir. 1972). Furthermore, where the items to be seized are created for the purpose of preservation, as are business records, the passage of time is also less significant. See United States v. Williams, 124 F.3d 411, 421 (3d Cir. 1997). In the present case, as noted, the relationship between Kim's and the Partnership was of considerable duration, and the warrant authorized a search for standard categories of business records. Businesses typically retain such records for an extended period of time -- certainly for more than 11 months. For these reasons, we hold that it was objectively reasonable for the executing officers to believe that the evidence supporting the search warrant was not stale.5

5. Kim's argued that the District Court improperly considered information outside of the affidavit in its ruling that the affidavit supported a finding of probable cause. Because we find that the warrant was executed in good faith, we need not address this issue.

IV.

A.

Kim's contends that the warrant in this case was a "general warrant" and so plainly lacked the requisite particularity concerning the items to be seized that official reliance on it was unreasonable. The Fourth Amendment provides that "no Warrant shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." The Fourth Amendment does not prohibit searches for long lists of documents or other items provided that there is probable cause for each item on the list and that each item is particularly described.

"The particularity requirement 'makes general searches . . . impossible.' " United States v. Christine, 687 F.2d 749, 752 (3d Cir. 1982) quoting Marron v. United States, 275 U.S. 192, 196 (1927); see also, e.g., Stanford v. Texas, 379 U.S. 476, 510 (1965). A general warrant authorizes "a general, exploratory rummaging in a person's belongings." Coolidge v. New Hampshire, 403 U.S. 443, 467 (1971). In order for a warrant to be invalidated as general, it must "vest the executing officers with unbridled discretion to conduct an exploratory rummaging through [defendant's] papers in search of criminal evidence." Christine, 687 F.2d at 753. As we noted in Christine, examples of general warrants are those authorizing searches for and seizures of such vague categories of items as " 'smuggled goods,' " " 'obscene materials,' " " 'books, records, pamphlets, cards, receipts, lists, memoranda, pictures, recordings and other written instruments concerning the Communist Party of Texas,' " " 'illegally obtained films,' " and " 'stolen property.' " Id. (citations omitted).

We have contrasted a "general warrant" with a warrant that is simply overly broad. An overly broad warrant "describe[s] in both specific and inclusive generic terms what is to be seized," but it authorizes the seizure of items as to which there is no probable cause. Christine, 687 F.2d at 753-54. An overly broad warrant, however, can be cured by redaction, that is, by "striking from [the] warrant those

severable phrases and clauses that are invalid for lack of probable cause or generality and preserving those severable phrases and clauses that satisfy the Fourth Amendment." Id. at 754. Evidence seized pursuant to an overly broad

warrant need not be suppressed if the good faith exception applies.

B.

Contrary to Kim's argument, the warrant here was neither general nor so plainly in violation of the particularity requirement that the executing officers could not have reasonably trusted in its legality. Although the scope of the warrant was certainly extensive, the warrant was not general. The warrant authorized a search for and seizure of the following :

> 1) Receipts, invoices, lists of business associates, delivery schedules, ledgers, financial statements, cash receipts, disbursement, and sales journals, and correspondence.

> 2) Computers, computer peripherals, related instruction manuals and notes, and software in order to conduct an off-site search for electronic copies of the items listed above.

JA at 179, 181. The warrant thus "describ[ed] in . . . inclusive generic terms what is to be seized." Christine, 687 F.2d at 753. It did not vest the executing officers with "unbridled discretion" to search for and seize whatever they wished. Id. It was indubitably broad, but it was not "general."

Moreover, we think that reasonable officers could have easily believed that the warrant was not even overly broad with respect to the categories of items to be seized. To be sure, the warrant authorized a search for and the seizure of entire categories of legitimate business records, but it is critical to keep in mind that a principal purpose of the warrant was to prove a negative, viz., that Kim's had not engaged in legitimate business transactions with the sham groceries from which Kim's had received large cash payments.

15

The previously quoted passage from the affidavit, which Kim's attacks, shows why there was probable cause to seize the categories of business records covered by the warrant. This passage stated:

> [W]holesale food companies that are engaged in food stamp trafficking and money laundering . . . maintain records of their legitimate business activity both at their commercial locations and at private residences to which they have access. These records include receipts, invoices, lists of business associates, records of telephone numbers, delivery schedules, ledgers, financial statements, cash receipt, disbursement, and sales journals, and correspondence. This information is relevant because it shows the extent to which the businesses have been engaged in legitimate commerce.

JA at 119 (emphasis added). In other words, if Kim's had engaged in legitimate business transactions with the grocery stores in question -- if, for example, it had sold them groceries -- its "receipts, invoices, lists of business associates, records of telephone numbers, delivery schedules, ledgers, financial statements, cash receipt, disbursement, and sales journals, and correspondence" would have evidenced such transactions. And if evidence of such legitimate transactions was missing from Kim's "receipts, invoices, lists of business associates, records of telephone numbers, delivery schedules, ledgers, financial statements, cash receipt, disbursement, and sales journals, and correspondence," it was reasonable to infer that no such legitimate transactions had occurred. But in order to show that evidence of such transactions was lacking, it was necessary to examine all of Kim's "receipts, invoices, lists of business associates, records of telephone numbers, delivery schedules, ledgers, financial statements, cash receipt, disbursement, and sales journals, and correspondence" -- at least for the relevant period of time. Consequently, a reasonable officer could easily have believed that the breadth of the warrant in this case was justified. 6

_____

6. It is also important to keep in mind that the warrant was issued, not only to search for evidence of food stamp fraud, but also to search for evidence of money laundering and conspiracy to commit money

The dissent contends that the warrant was plainly flawed because it was not "limited . . . to documents bearing some relation to Kim's transactions with the targeted grocery stores or the individuals known to be participants in the fraud" and because it did not specify "the generic types of crimes, i.e., food stamp trafficking or money laundering, to which the items designated for seizure pertained." Dissent at 27. However, this argument simply overlooks the fact that the investigation in this case sought to prove a negative (that Kim's had not engaged in legitimate sales to the sham groceries). In order to show that no such sales had occurred, it was necessary to search for and seize all of the files in which a record of such transactions would have been kept. Searching for and seizing only those records that positively showed illicit transactions would not have sufficed. For this reason, it was objectively reasonable for the executing officers in this case to believe that the warrant properly authorized a search for and seizure of the categories of Kim's business records that the warrant set out.

Kim's contends that the warrant violated the particularity requirement because it did not restrict the search and seizure to documents concerning transactions that occurred during the time period of the illegal food stamp trafficking scheme. In a similar vein, the dissent argues that the warrant, at most, should have covered documents from the period 1994 to 1997 and not for the period 1984

to 1993. Dissent at 26. This argument, however, does not provide a ground for suppressing the evidence supporting the judgment of forfeiture.

_____

laundering and that these latter offenses include the use of the proceeds of food stamp fraud in a variety of different ways. See 18 U.S.C. S 1956 (a)(1). For example, the knowing use of any of the funds (more than $1.3 million) that Kim's received from the sham groceries to further the illegal scheme or to conceal the origins of the funds might constitute a violation of the money laundering statute. See 18 U.S.C. S 1956 (a) and (c). A transaction as seemingly innocent on its face as the purchase of groceries to be supplied to a restaurant in exchange for fraudulently obtained food stamps might qualify, and there was thus probable cause to search for and seize broad categories of records.

17

The warrant at issue here was tantamount to one authorizing a search for records for the years 1984, 1985, 1986, etc. through 1997. If the dissent is correct that the warrant should not have covered documents from 1984 to 1993, that flaw renders the warrant overly broad, not general. The inclusion of the period from 1984 to 1993 did not "vest the executing officers with unbridled discretion to conduct an exploratory rummaging through [defendant's] papers in search of criminal evidence." Christine, 687 F.2d at 753. Rather, the inclusion of those years simply authorized a search for documents as to which there may not have been probable cause. Under our decision in Christine, the proper remedy for this putative defect was simply to excise the years for which there was no probable cause. At most, the lack of time restrictions meant that the warrant was overly broad, not general. Kim's could have, but did not, move for redaction of the warrant on this ground. (Redaction is unlikely to have helped Kim's since one would expect that the documents upon which the government relied to show that bank funds in question were involved in the illegal scheme would fall within the time period of the scheme.) In any event, the absence from the warrant of a provision limiting the search and seizure to documents pertaining to the time period of the scheme did not make the warrant "so facially deficient" "as to render official belief in its [legality] entirely unreasonable." Hodge, 246 F.3d at 308. Accordingly, the Leon exception to the exclusionary rule precludes suppression of evidence on this ground.

In Massachusetts v. Sheppard, 468 U.S. 981 (1984), the companion case to Leon, the Supreme Court applied the good faith doctrine to a case in which a warrant had been invalidated because it was overly broad. See also United States v. Kepner, 843 F.2d 755, 763 (3d Cir. 1988). In Sheppard, the police wished to search the residence of the boyfriend of a murder victim. The supporting affidavit specified that police wanted to search the defendant's residence for "[a] fifth bottle of amaretto liquor, 2 nickel bags of marijuana, a woman's jacket that has been described as black-grey (charcoal), possessions of[the

victim], similar type wire and rope that match those on the body of [the victim], or in the above [Thunderbird]. [A]

18

[b]lunt instrument that might have been used on the victim. Men's or women's clothing that may have blood, gasoline, burns on them. Items that may have fingerprints of the victim." Id. at 985 (quoting the affidavit). The police sought the warrant on a Sunday and were thus unable to obtain the appropriate warrant form. The investigating detective found a warrant form used in another county for searches for controlled substances and brought the warrant to the judge. After reading the affidavit, the judge agreed to authorize the requested warrant and made necessary changes to the controlled substance warrant form in order to tailor it to the case at hand. However, the judge failed to change the directory portion of the warrant, which authorized a search for "any controlled substance, article, implement or other paraphernalia used in, for, or in connection with the unlawful possession or use of any controlled substance . . . ." Id. at 987 n.2 (quoting the warrant form). The warrant was thus overly broad.

The Supreme Court held that the Leon exception to the exclusionary rule applies where executing officers reasonably believe that a search is authorized by a warrant that is too broad. The Court observed that a police officer is not required to question a judge who has just advised him that the warrant he possesses authorizes him to conduct the requested search; as the exclusionary rule was developed to "deter unlawful searches by police,[and] not to punish the errors of magistrates and judges," suppression is inappropriate. Sheppard, 468 U.S. at 990 quoting Gates, 462 U.S. at 263 (White, J., concurring in judgment).

The absence of limiting dates in the warrant in the present case is, at worst, similar to the defect in the warrant in Sheppard. The officers in the present case conducted a lengthy investigation; they reviewed numerous bank transactions; they painstakingly assembled all of the information collected during the investigation, presented it to a neutral and detached Magistrate Judge, and then revised the affidavit and re-presented it to the Magistrate Judge, who found probable cause to issue a warrant.

The members of the Magistrate Judge corps are highly qualified. They are chosen based on merit by the District Court, and competition for Magistrate Judge positions is

19

keen. Magistrate Judges typically have more experience with issues involving warrants than any other judicial officers. The Magistrate Judge in this case believed that the warrant was proper and thus issued it. When a Magistrate Judge has made such a determination, law enforcement officers, who are rarely attorneys, are entitled to rely on the

Magistrate Judge's judgment, except in rare circumstances, such as where the warrant is so plainly defective in form that even a lay officer could not believe in good faith that the warrant was proper. That narrow circumstance is not present here, and we therefore hold that suppression is not justified.

V.

A.

Kim's final argument is that the officers who executed the warrant violated the Fourth Amendment by seizing all documents written in Chinese, regardless of content, without first determining whether the documents fell within one of the categories specified in the warrant that violated the Fourth Amendment. Kim's contends that the government should have been required to send a person who was able to read Chinese to the scene of the search in order to determine whether documents written in Chinese fell within the warrant's scope. Because these arguments raise important Fourth Amendment questions that are not specifically governed by binding precedent, we address the Fourth Amendment issues before turning to the Leon good faith exception. See Leon, 468 U.S. at 925.

B.

The affidavit in this case explained how the agents planned to deal with the problem of documents written in Chinese. The affidavit stated:

> We anticipate that some of the records on the premises to be searched will be recorded in a chinese dialect. The government will attempt to assign an agent who is fluent in at least one chinese dialect to the search

> teams. It may nonetheless be impossible to screen foreign language documents for relevance on the premises either because they are in a dialect unknown to our agents or because we are unable to staff the search location with a chinese speaking agent. We will seize all records that we cannot read. After these records have been reviewed by someone familiar with the dialect used, all records not described in this search warrant shall be returned.

JA at 176-77 (emphasis added). According to the government's brief, the warrant for the search of Kim's was one of 23 arrest and search warrants that were executed at the same time by approximately 180 federal and state law enforcement officials, approximately ten of whom spoke Chinese. Appellee's Br. at 41 n.3. No officer able to speak Chinese was sent to Kim's. Id. Thus, if the agents who executed the warrant at Kim's proceeded as stated in the affidavit, they seized all documents written in Chinese. The government represents in its brief that all of the seized

documents written in Chinese "fell into one of two categories of documents specified by the warrant: invoices and ledgers," id. at 40-41, and in view of the scope of the warrant, this may well be true. However, the point is not conceded by Kim's and the record as it now exists apparently does not show whether or not the government's representation is true.

C.

The affidavit in this case did not provide probable cause for the seizure of all documents in Chinese, and the warrant did not authorize the seizure of all such documents. This does not mean, however, that the government was necessarily required to send an agent who was able to read Chinese to Kim's to assist in the execution of the warrant. "The general touchstone of reasonableness which governs Fourth Amendment analysis . . . governs the method of execution of the warrant," United States v. Ramirez, 523 U.S. 65, 71 (1998) (citation omitted), and there are plainly circumstances in which it is reasonable to execute a warrant for documents in a foreign language (or for technical records) without the assistance of an officer

21

who is capable of understanding the materials sought. Reasonableness is determined "by assessing, on the one hand, the degree to which [a search or seizure] intrudes upon an individual's privacy and, on the other, the degree to which [the search or seizure] is needed for the promotion of legitimate governmental interests." Wyoming v. Houghton, 526 U.S. 295, 300 (1999) (citation omitted). If, for example, there is an urgent need to execute a warrant for documents written in a language that relatively few people in the jurisdiction can read, it may be reasonable to proceed without the assistance of someone able to read the language. If officers were obligated in such a situation to wait until someone who is able to read the language can be found and assigned to assist with the search, vital evidence could be lost, and as we will explain, there are alternative means of minimizing the intrusion on privacy that immediate execution of the warrant would produce. Thus, Kim's suggestion that an agent who is able to read the language must always be assigned to the team executing the warrant is unreasonable.

At the same, we do not embrace the suggestion that executing officers may always "seize all records that [they] cannot read." If officers who are able to read the language in question are readily available, the failure to assign such an officer to assist in executing the warrant may be unreasonable. Furthermore, even if there is a sufficient reason not to assign such a person, the warrant must still be executed in a reasonable manner. The privacy of those whose Fourth Amendment interests are affected by the search should not be infringed to a greater degree than is reasonably necessary to serve the legitimate interests of law enforcement.

One reasonable way of proceeding is outlined in the Model Code of Pre-Arraignment Procedure S SS 220.5 (1975), which recommends that where "documents to be seized cannot be searched for or identified without examining the contents of other documents, . . . the executing officer shall not examine the documents but shall either impound them under appropriate protection where found, or seal and remove them for safekeeping pending further proceedings . . . ." Id. at S 220.5(2). Promptly

following the removal or impoundment of the documents, an executing officer should "report the fact and circumstances of the impounding or removal to the issuing official. As soon thereafter as the interests of justice permit, and upon due and reasonable notice to all interested persons, a hearing shall be held before the issuing official . . . at which the person from whose possession or control the documents were taken . . . may appear . . . and move (a) for the return of the documents . . . in whole or in part, or (b) for specification of such conditions and limitations on the further search for documents to be seized as may be appropriate to prevent unnecessary or unreasonable invasion of privacy." Id. at S 220.5(3). This adversary hearing enables the moving party to request that certain procedures be used to "prevent excessive invasions of privacy." Note to Model Code of Pre-Arraignment Procedure S SS 220.5; see also United States v. Tamura, 694 F.2d 591, 595-97 (9th Cir. 1982). These procedures may include conducting the search in the presence of counsel, allowing the moving party to demonstrate that certain files or portions of intermingled documents could not possibly fall within the scope of the search warrant, or requiring that the search be conducted by a special master. See id.

D.

In the present case, the record is insufficient to determine whether the Fourth Amendment was violated as a result of the seizure of documents in Chinese. Although the government's brief makes representations relating to the need to execute the warrant at Kim's without assigning an officer able to read Chinese, it does not appear that the present record supports those representations. Moreover, it does not appear that the record reveals whether any documents that did not fall within the scope of the warrant were taken from Kim's. If no such documents were taken, then there was no violation of the Fourth Amendment. If such documents were taken and retained, there may or may not have been a violation.7 And if there was a violation,

---

7. There might not be a violation if a cursory examination of such documents to determine whether they fell within the scope of the warrant revealed that they evidenced criminal activity. Of course, the handling of the documents up to the point of examination would also have to comply with Fourth Amendment requirements.

there may or may not be grounds for reversing the judgment of forfeiture.

Because of these gaps in the record, we believe that it is advisable to vacate the judgment of forfeiture and remand to the District Court for further proceedings. On remand, Kim's should identify any documents that were taken in the search and do not fall within any of the categories of documents set out in the warrant. If any such documents are identified, the government should be given the opportunity to establish either that the seizure of these documents was permitted by the Fourth Amendment or that the Leon exception to the exclusionary rule precludes suppression.8

VI.

For the reasons explained above, we reject Kim's arguments relating to probable cause and particularity. However, because of gaps in the present record relating to the seizure of documents written in Chinese, we vacate the judgment of forfeiture and remand to the District Court for further proceedings concerning this issue only.

_____

8. We express no view on the question whether the good faith exception would apply here if a Fourth Amendment violation is found.

AMBRO, Circuit Judge, dissenting:

The Kim's warrant was so lacking in particularity that no reasonably well-trained officer could execute it in good faith. Thus, I respectfully dissent.1

The Fourth Amendment requires that a warrant describe with particularity the place to be searched and the things to be seized. Coolidge v. New Hampshire, 403 U.S. 443, 467 (1971). To pass constitutional muster, specificity"[a]s to what is to be taken" is necessary so that "nothing is left to the discretion of the officer executing the warrant." Marron v. United States, 275 U.S. 192, 196 (1927). Moreover, when a warrant is "so facially deficient--i.e. , in failing to particularize the place to be searched or the things to be seized--that the executing officer cannot reasonably presume it to be valid," the good faith exception to the exclusionary rule is inapplicable. United States v. Leon, 468 U.S. 897, 923 (1984).

I. The Kim's warrant lacked constitutionally required specificity.

The Kim's warrant was so inexact that the executing officers could not have reasonably presumed its validity. It

allowed the seizure of the following items:

> Receipts, invoices, lists of business associates, delivery schedules, ledgers, financial statements, cash receipt, disbursement, and sales journals, and correspondence.

> Computer, computer peripherals, related instruction manuals and notes, and software in order to conduct an off-site search for electronic copies of the items listed above.

This warrant vested the executing officers with carte blanche to seize all documents -- even those written in Chinese -- regardless whether the agents knew what the

---

1. I agree with the majority that the record is inadequate to resolve Kim's argument with respect to the seizure of documents written in Chinese. In my opinion, however, that issue would not be reached, as all the evidence taken from Kim's should be suppressed due to the constitutionally defective warrant in this case.

25

documents were or how they related to the investigation. By doing so, the Government ignored its burden of drafting the Kim's warrant as specific as possible based on the information available at the time of the search. United States v. American Investors of Pittsburgh, Inc., 879 F.2d 1087, 1106 (3d Cir. 1989). Here, that limiting information would have included Kim's alleged time period of involvement and criminal activity.2

A. The warrant should have been limited to Kim's alleged dates of involvement.

As noted by the majority, the warrant did not qualify its generic list of business records by providing a description of the relevant time period under investigation. While the allegations pertaining to Kim's took place exclusively in 1996, and while those that pertained to the partnership at large occurred from 1994 to 1997, the warrant bestowed license to forage through any records found at Kim's, even those dating from its opening in 1983 through 1994, a period during which there is no suggestion on the record before us that Kim's conducted anything but legitimate business. By itself, this deficiency resulted in an unconstitutionally broad warrant. United States v. Ford, 184 F.3d 566, 576 (6th Cir. 1999) ("Failure to limit broad descriptive terms by relevant dates, when such dates are available to the police, will render a warrant overbroad.").

In defending this omission, the majority asserts that "[a]t most, the lack of time restrictions meant that the warrant was overly broad, not general." Maj. Op. at 18. Controlling case law suggests otherwise. A general warrant is one authorizing "a general exploratory rummaging in a person's belongings." Coolidge, 403 U.S. at 467. For example, Stanford v. Texas, 379 U.S. 476 (1965), involved a general

warrant. There, the warrant authorized the seizure of
"books, records, pamphlets, cards, receipts, lists,
memoranda, pictures, recordings and other written

_____

2. Based on the information contained in its affidavit, the Government
also could have limited the search and seizure to documents bearing
some relation to Kim's transactions with the targeted grocery stores or
the individuals known to be participants in the fraud.

instruments concerning the Communist Party of Texas." Id.
at 486. The warrant here--which contained no  limitations
as to the time period, transactions, activities, or crimes
involved--is not even as specific as that in Stanford, which
was found to be unconstitutionally general.

B. The warrant should have been limited to Kim's
alleged criminal activity.

Further, the warrant could have specified the generic
types of crimes, i.e., food stamp trafficking or money
laundering, to which the items designated for seizure
pertained. United States v. George, 975 F.2d 72, 77 (2d Cir.
1992) (refusing to apply the Leon good faith exception
because "a warrant not limited in scope to any crime at all
is so unconstitutionally broad that no reasonably well-
trained police officer could believe otherwise") (emphasis in
original). This defect is fatal, and distinguishes this case
from United States v. Conley, 4 F.3d 1200 (3d Cir. 1993),
which the Government cites for the proposition that the
warrant was not facially deficient. In Conley , our Court
reviewed a decision of the District Court to suppress based
on its finding that a search warrant for the premises of a
business which leased poker machines failed to establish
probable cause. On appeal, defendants maintained that the
warrant at issue was overbroad because it authorized the
seizure of

> [a]ll video poker machines, keys for machines,
> accounting records, all revenue records, employee
> records, purchase orders from distributors and
> manufactors [sic] of video poker machines, all records
> showing poker machine locations and any and all
> paraphernalia indicative of a gambling operation.

4 F.3d at 1204. Our Court rejected the argument, finding
that the warrant satisfied the particularity requirement of
the Fourth Amendment because it fairly limited the search
to items related to the illegal gambling operation under
suspicion. Id. at 1208.

In contrast, the Kim's warrant did not so much as allude
to the illegal activity under investigation. An agent
reviewing and implementing the warrant on Kim's would

have no basis to distinguish between business records and receipts relating to suspected illegal conduct and those that were altogether irrelevant and innocuous. The Kim's warrant did not meaningfully limit the intrusion into personal privacy because it failed to direct the officers to seize only items probative of crimes, here money laundering and/or food stamp fraud. Cf. United States v. McClintock, 748 F.2d 1278, 1282-83 (9th Cir. 1984) (approving warrant containing the language "any and all items referring to the sale of diamonds and other gemstones which are evidence of a violation of Title XVIII"); United States v. Dennis, 625 F.2d 782, 792 (8th Cir. 1980) (upholding a warrant which called for seizure of "certain books and records (or items of evidence) relating to the extortionate credit transaction business"); Grimaldi v. United States, 606 F.2d 332, 337, 339 (1st Cir. 1979) (holding that the phrase "paraphernalia used in the manufacture of counterfeit federal reserve notes" was an adequate means of limiting the warrant).

The majority justifies the Government's failure to include a phrase limiting the warrant to the alleged criminal activity because "the investigation in this case sought to prove a negative (that Kim's had not engaged in legitimate sales to the sham groceries)." Maj. Op. at 17 (emphasis in original). This position essentially endorses a fishing expedition where the Government is allowed to seek evidence of legitimate, not illegitimate, conduct.[3]  Further, this "negative" proof argument contradicts the Supreme Court's dictate that before a search warrant may issue, the magistrate judge must be satisfied that "there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983) (emphasis added). Contrary to the majority's assertion, the Government can obtain a warrant only for evidence suggesting illegal conduct, not for evidence, or a dearth of evidence, suggesting legal conduct.

The majority exacerbates this misapprehension of law by

_____

3. Ironically, the majority contradicts its own"negative" proof argument by also stating that the Government seized the documents to prove a positive, i.e., as actual direct evidence of a money laundering scheme. Maj. Op. at 16 n.6.

stating that "in order to show that evidence of such transactions was lacking, it was necessary to examine all of Kim's 'receipts, invoices, lists of business associates, records of telephone numbers, delivery schedules, ledgers, financial statements, cash receipt, disbursement, and sales journals and correspondence.' " Maj. Op. at 16 (emphasis in original). This argument essentially suggests that Kim's was "permeated with fraud," or was so extensively involved in the scheme that it affected every level of its organization. Rickert v. Sweeney, 813 F.2d 907, 909 (8th Cir. 1987).

However, the Government's own brief and affidavit undermine the majority's analysis. A business does not qualify as "permeated with fraud" if it is an actual legitimate business which is merely involved in a particular criminal activity for a finite period of time. United States v. Kow, 58 F.3d 423, 428 (9th Cir, 1995). Here, the Government itself acknowledges that Kim's was first established in 1983, over ten years prior to the business' first alleged involvement in the scheme, and that during 1995 and 1996 Kim's received only 13% of its total revenue from the alleged scheme. Government's Br. at 24. By all accounts, Kim's was a legitimate business even when it was participating in the scheme. More importantly, there is no evidence of its criminal involvement during the first twelve years of its existence. Under these circumstances, Kim's does not qualify as an entity "permeated with fraud," and thus, the majority errs by justifying a wholesale seizure of all business records.

II. The Government took no steps to limit the scope of the search and seizure.

In addition to its inadequate drafting, the Government failed to undertake subsequent measures to limit the scope of the search and seizure. The affidavit was not incorporated into or attached to the warrant, and therefore the affidavit cannot serve as a source of additional specificity. See United States v. Johnson, 690 F.2d 60, 64 (3d Cir. 1982) (holding that where an affidavit is incorporated by reference into the warrant, the affidavit can cure the warrant's lack of particularity).

29

Further, Agents Thomerson and McElravy, the officers who swore out the affidavit, failed to supervise the Kim's search and seizure. Their inaction distinguishes this case from United States v. Kepner, 843 F.2d 755 (3d Cir. 1988), which the majority cites for support without actual discussion. In Kepner we upheld a warrant that authorized the search and seizure of "documents, records, and personal effects" of Thomas Kepner, a union official who was the subject of a continuing investigation into labor racketeering. The application and accompanying affidavit used more specialized language than the warrant, alleging probable cause to believe that a search of the condominium would yield "clothing, documents, records, diaries, and correspondence that establish [Kepner's] use and control of the condominium unit as well as his illegal receipt of prohibited benefits." Id. at 762 (alteration in original). Even though the search team in Kepner did not have a copy of the affidavit handy, the lead agent who drew up the affidavit carefully instructed his team as to the scope of the search and "took responsibility for determining whether every piece of seized evidence fell within the scope of the warrant." Id. at 763-64. Comparable diligence was not exercised here.

Similarly, the majority places considerable emphasis on

Massachusetts v. Sheppard, 468 U.S. 981 (1984), in which the Supreme Court allowed the good faith exception to proceed where a warrant was invalidated by a state appellate court for failing to describe the "things to be seized." Though the warrant in Sheppard authorized an expansive search without specific description of the items to be seized, the detective who prepared the affidavit and secured the warrant made every effort to correct inaccuracies in the form warrant, personally supervised the search of Sheppard's residence, and brought along a copy of the affidavit to the search. Id. at 985-89. In other words, the critical factor motivating the Supreme Court to disregard the judge's clerical oversight was the fact that the officers "took every step that could reasonably be expected of them." Id. at 989. In contrast, the officers here took no steps to limit the search and seizure of Kim's business records.

More comparable is United States v. Leary, 846 F.2d 592 (10th Cir. 1988), where the Tenth Circuit affirmed a suppression order on the grounds that the warrant was so facially overbroad as to negate any claim of good faith. The warrant in Leary, predicated on probable cause to believe that the defendant had engaged in an illegal export transaction, authorized the search of an export company for

> [c]orrespondence, Telex messages, contracts, invoices, purchase orders, shipping documents, payment records, export documents, packing slips, technical data, recorded notations, and other records and communications relating to the purchase, sale and illegal exportation of materials in violation of the Arms Export Control Act, 22 U.S.C. 2778, and the Export Administration Act of 1979, 50 U.S.C. App. 2410.

846 F.2d at 594. The search generated twenty boxes of business records, most unrelated to the investigation. See id. at 594-95. The Court held that the warrant, which "encompassed virtually every document that one might expect to find in a modern export company's office," was facially deficient in light of the fact that the Government had in its possession information that it could have used to limit more precisely the description of the documents to be seized. Id. at 600-02.

As in Leary, information was readily available to the Government in this case to make the warrant's description of the records to be seized substantially more specific. Instead, the Government rejected more precise language, and the sweeping results speak for themselves: the Government confiscated thirty-six boxes of documents, a filing cabinet, two computers, twelve plastic bags containing brown paper bags, and U.S. currency.

III. Suppression is the only appropriate remedy.

Finally, the majority misapplies the redaction remedy endorsed in United States v. Christine, 687 F.2d 749, 759 (3d Cir. 1982). While conceding that the warrant should have included time restrictions, the majority states that Christine's redaction concept may cure this defect by

authorizing a reviewing court to insert the relevant dates into the Kim's warrant. This reasoning stretches Christine to the majority's Procrustean bed by endorsing the rewriting, not the redacting, of this unconstitutional warrant. But as Christine makes clear, redaction does not include inserting new terms into a warrant. Instead,"[b]y redaction, we mean striking from a warrant those severable phrases and clauses that are invalid for lack of probable cause or generality and preserving those severable phrases and clauses that satisfy the Fourth Amendment." Id. at 754 (emphases added). This definition does not include redrafting a document to add time or criminal activity limitations, especially when, as here, the warrant contained no such "phrases and clauses" in the first place.

"Redaction is inappropriate when the valid portions of the warrant may not be meaningfully severable from the warrant as a whole." Id. When, as with the Kim's warrant, "no portion of the warrant is sufficiently particularized to pass constitutional muster, then total suppression is required." Kow, 58 F.3d at 427-28 (refusing to allow redaction or apply the good faith exception when the Government "did not limit the scope of the seizure to a time frame within which the suspected criminal activity took place" and failed "to describe . . . the specific criminal activity suspected."); see Christine, 687 F.2d at 758 ("It is beyond doubt that all evidence seized pursuant to a general warrant must be suppressed."). Similar to the warrant in Kow, no portion of the Kim's warrant is limited by reference to dates or criminal activity. In this situation, redaction is not only inappropriate, it is wholly unfeasible.

IV. Conclusion

Any number of measures--limiting the warrant by relevant time period, transactions, or criminal activities, incorporating or attaching the affidavit, supervising the search to limit the officers' discretion--could arguably have allowed this warrant to survive constitutional scrutiny. The Government chose instead to draft a general warrant the Fourth Amendment explicitly forbids. Further, "[w]hen the Supreme Court announced the good faith exception in Leon, it weakened the exclusionary rule, but it did not

eviscerate it. Good faith is not a magic lamp for police officers to rub whenever they find themselves in trouble." United States v. Zimmerman, 277 F.3d 426, 437-38 (3d Cir. 2002). Sensing that it was indeed in trouble, the

Government conceded at oral argument that the Kim's warrant "could have been written better, and should have been written better." This admission is an understatement of unconstitutional proportion. To sanction it nonetheless lets Leon's good faith exception swallow the Fourth Amendment's rule. I respectfully dissent.

A True Copy:
Teste:

       Clerk of the United States Court of Appeals
       for the Third Circuit

33