

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-3-2005

# USA v. Ritter

Precedential or Non-Precedential: Precedential

Docket No. 04-3489

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"USA v. Ritter" (2005). *2005 Decisions.* Paper 627.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/627

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 04-3489

UNITED STATES OF AMERICA;
GOVERNMENT OF THE VIRGIN ISLANDS,
                                      Appellants

v.

ERNIE RITTER;
REGGY RITTER;
DALE RITTER

Appeal from the District Court
of the Virgin Islands
(District Court Criminal No. 04-cr-00007)
District Court Judge:  Raymond L. Finch

Argued: April 20, 2005

Before:  NYGAARD*, RENDELL and SMITH, <u>Circuit</u>
<u>Judges</u>

**\*Honorable Richard L. Nygaard assumed senior status on July 9, 2005**

(Filed:   August 3, 2005)

Bruce Z. Marshack
Office of the U.S. Attorney
1108 King Street, Suite 201
Christiansted, St. Croix
USVI,  00820

Richard A. Friedman     **[ARGUED]**
U.S. Department of Justice, Room 1264
Criminal Division, Appellate Section
10th Street & Constitution Avenue N.W.
Washington, DC  20530
   *Counsel for Appellants*
     *United States of America;*
     *Government of the Virgin Islands*

Jomo Meade     **[ARGUED]**
112 Queen Cross Street
Frederiksted, St. Croix
USVI,  00840
   *Counsel for Appellee Ernie Ritter*

Martial A. Webster
116 Queen Cross Street
Frederiksted, St. Croix
USVI,  00851
   *Counsel for Appellee Reggy Ritter*

*(continued)*

Thurston T. McKelvin     **[ARGUED]**
Kirsten G. Downs
Office of Federal Public Defender
P.O. Box 223450
Christiansted, St. Croix
USVI,  00822
   *Counsel for Appellee Dale Ritter*

————————

OPINION OF THE COURT

————————

RENDELL, <u>Circuit Judge</u>.

The United States of America and the Government of the Virgin Islands (collectively, the "government") appeal from the order of the District Court of the Virgin Islands granting brothers Ernie, Reginald and Dale Ritter's motion to suppress physical evidence.  We will vacate the order of the District Court and remand for further findings consistent with this opinion.

## I. BACKGROUND

### A.      Facts

In August of 2002, while conducting aerial surveillance, Officer Christopher Howell of St. Croix, Virgin Islands, working jointly with the Federal Drug Enforcement Administration High Intensity Drug Trafficking Area Task Force ("Task Force"), observed marijuana growing in a roofless stable at the rear of a house in Fredericksted, St. Croix. A man could be seen tending the plants. Officer Howell notified Task Force ground units, who entered the premises without a warrant, destroyed the growing marijuana plants and apprehended the gardener. The gardener admitted cultivating and tending the plants but denied residing in the house; no charges were filed against him. Three additional plots of marijuana plants growing in a field behind the house were also discovered and destroyed during the raid.

The following Spring, on April 24, 2003, Officer Howell received the first of two anonymous calls relating to the property previously surveilled and indicating that its residents were growing marijuana on the premises. The unidentified female caller advised Officer Howell that the "occupants of the house" – no names were provided –  were growing marijuana "to the rear of their residence." She advised that there were "'hundreds of plants' located in the horse stables and the field adjacent to

- 4 -

the stables." (Howell Affidavit.) Officer Howell noted the information but took no immediate action.

Two weeks later, on May 7, 2003, Officer Howell received a second call. Again, the caller remained anonymous, but Officer Howell testified that he believed it to be the same person who had placed the April call. The second call provided additional information: the informant repeated the allegation that marijuana was being grown in the back of the residence but added that she had personally observed someone carrying plants into the house, and she had heard from another person that there were at least two indoor grow rooms inside the house. The tipster, however, did not name or describe any of the residents of the house, nor did she indicate precisely where in the house plants were growing. Officer Howell did not remember asking for more specific information.

Following the second call, Officer Howell immediately applied for a warrant, basing his affidavit in support of probable cause on both the 2002 raid and the information provided by the anonymous tipster. Other than to draw upon his previous experience in 2002, Officer Howell did not undertake any additional corroborative investigation to determine, *inter alia*, how many individuals resided in the house at issue. The affidavit identified the property by reference to an aerial

photograph ("Attachment 'A'"),[1] which shows a large main structure or residence with at least two outside doors visible, along with two additional structures on the premises. The warrant subsequently issued by the Magistrate Judge identified the premises to be searched as "No known number New Street Frederiksted St. Croix U.S.V.I. further pictured on Attachment 'A'",[2] and authorized the government to search for "marijuana and items used to process, and facilitate the growing of marijuana, i.e., lighting, air-conditioning units, ventilation units, scales and packaging materials."

Howell was one of many law enforcement officers present for the execution of the warrant the following day. However, at the suppression hearing before the District Court,

---

[1]At no time have the parties disputed that Attachment "A" features the Ritters' property and is the same property that was the subject of the 2002 raid initiated by Officer Howell's aerial surveillance.

[2]The parties now agree that the property's correct description is 87 Mars Hill. However, Officer Howell testified that Mars Hill "is part of New Street" and that confusion as to addresses on the island illustrated the need to attach a photograph of the premises to be searched.

he was the only witness to testify regarding the raid.[3]  Officer Howell explained that those present on the scene included various "teams" – entry teams (who conduct an initial sweep of the premises for people), perimeter teams (who secure the perimeter) and search teams (who conduct a more thorough search and actually seize evidence).  At some point during the warrant's execution, entry team members, who were the first to infiltrate the premises, realized that the property's main structure was not a single dwelling but, rather, consisted of at least four separate apartments.  The record indicates that each of the defendant brothers – Ernie, Dale and Reginald – occupied separate apartments, although it is not clear which of the brothers, other than Dale, was home at the time of the raid.  Despite the discovery of multiple units in the residence, after the entry teams finished their preliminary sweep, search teams were sent in to more thoroughly search the premises and collect evidence.  While the record does not make clear whether Officer Howell even entered the house, he testified as to the evidence observed and seized inside.[4]

---

[3]Only two witnesses testified in total – Howell and Andre Peterson, an investigator for the Office of the Public Defender.

[4]Howell himself was on a perimeter team.  He described his responsibility as the "affiant on the search" by stating: "You might say that I, I decided who would do what during the course of the search."

Howell's testimony concerning the sequence of events is imprecise, but ultimately, marijuana, guns and cash were collected from various locations within the building, including the brothers' respective apartments. As predicted by the anonymous tipster, two indoor grow rooms, one downstairs and one upstairs, were discovered. Marijuana was also found growing in at least two more areas either in or outside the home. In addition, a rifle was found either laying or hanging on the bed of Ernie Ritter along with a second gun in his closet; money and drugs were found in the oven or broiler of Dale Ritter; and marijuana was discovered on Dale Ritter's person after a pat-down by officers.

## B.    District Court Proceedings

The District Court granted the defendants' motion to suppress all physical evidence.[5] Although the District Court rejected defendants' contentions that the warrant was not supported by probable cause and that it failed to adequately describe the location to be searched, the Court found that, based on what the officers discovered as to the true character of the residence, the warrant did not describe with particularity the place to be searched. Citing to the Supreme Court's opinion in *Maryland v. Garrison*, the District Court held that the warrant

---

[5]The motion was filed by defendant Ernie Ritter, and then joined by his brothers Reginald and Dale Ritter.

was facially deficient – in other words, the entry teams' discovery of multiple units inside the residence had essentially functioned to retroactively invalidate the search warrant. 480 U.S. 79, 86-87 (1987). According to the District Court, Howell and his fellow officers enjoyed a "windfall" but should not have acted upon it – "Once the police officers realized the building was a multi-unit dwelling, the Court holds that the search warrant was defective for failing to specify which unit(s) were to be searched."

The government contended that the warrant should nonetheless be deemed sufficient because the "good faith" exception should have applied. The District Court rejected this argument, noting that there are four situations in which the general presumption of good faith, which generally attaches based on the mere issuance of a warrant, is negated:

> (1) [when] the magistrate [judge] issued the warrant in reliance on a deliberately or recklessly false affidavit;
>
> (2) [when] the magistrate [judge] abandoned his judicial role and failed to perform his neutral and detached function;
>
> (3) [when] the warrant was based on an affidavit "so lacking in indicia of probable cause as to

render official belief in its existence entirely unreasonable"; or

(4) [when] the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized.

*U.S. v. Hodge*, 246 F.3d 301, 308 (3d Cir. 2001) (citation omitted). Based on the warrant's failure to particularize the place to be searched, the District Court found the warrant facially defective and based on the fourth factor above, declined to apply the good faith exception. "When the police officers realized that there were multiple dwelling units and the search warrant gave them no guidance as to which unit(s) were to be searched, the police officers could not be said to have been executing the warrant in good faith by subsequently searching at least four different residential units." All evidence seized pursuant to the search warrant, the District Court thus concluded, should be suppressed.

## II. ANALYSIS

### A.    Jurisdiction and Standard of Review

The District Court had jurisdiction under 48 U.S.C. § 1612; we have jurisdiction over this government appeal pursuant to 18 U.S.C. § 3731.

On a motion to suppress, the government bears the burden of showing that each individual act constituting a search or seizure under the Fourth Amendment was reasonable. *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995). With respect to a suppression order, we review the District Court's factual findings for clear error, *see United States v. Roberson*, 90 F.3d 75, 77 (3d Cir. 1996) (citing *Ornelas v. United States*, 517 U.S. 690, 699-700 (1996)), and exercise plenary review over its legal determinations, *see United States v. Coggins*, 28 V.I. 241, 986 F.2d 651, 654 (3d Cir. 1993). However, when a district court, in reviewing a magistrate's determination of probable cause, bases its probable cause ruling on facts contained in an affidavit, we exercise plenary review over the district court's decision. *United States v. Conley*, 4 F.3d 1200, 1204 (3d Cir. 1993) (citations omitted). In contrast, both our court and the district court exercise a deferential review of the magistrate's initial probable cause determination. *Id.* at 1205 (citing *Illinois v. Gates*, 462 U.S. 213, 236 (1983)).

**B.      Discussion**

The Fourth Amendment of the United States Constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The right of

security in person and property afforded by the Fourth Amendment may be invaded in various different ways by searches and seizures – here, defendants challenge the magistrate's issuance of the warrant as well as the government's execution of that warrant; however, "[i]t must always be remembered that what the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures," *Elkins v. United States*, 364 U.S. 206, 222 (1960).

### 1.      Probable Cause

The threshold requirement for issuance of a warrant is probable cause.  However, in reviewing the issuance of a warrant and given the historic preference expressed by our courts for the warrant process, *see Johnson v. United States*, 333 U.S. 10, 13-14 (1948), we are to determine whether the magistrate had a "substantial basis" for concluding that probable cause was present, *Illinois v. Gates*, 462 U.S. 213, 236 (1983). "[T]he Fourth Amendment requires no more." *Id.*  The District Court, viewing the "totality of the circumstances," *id.*, and deferring to a principle oft articulated by this Court – that "after-the-fact scrutiny should not take the form of *de novo* review," *see, e.g.*, *United States v. Ninety-Two Thousand Four Hundred Twenty-Two Dollars and Fifty-seven Cents ($ 92,422.57)*, 307 F.3d 137, 146 (3d Cir. 2002) (quoting *Gates*, 462 U.S. at 235) – could "not find that the search warrant application was devoid of probable cause," notwithstanding

- 12 -

Officer Howell's admission that he did nothing to independently corroborate the anonymous caller's tips. This conclusion, we think, requires discussion.

Ernie and Reginald Ritter claim on appeal that the District Court erred in concluding that there existed probable cause to support the magistrate judge's issuance of a warrant.[6] They assert that Officer Howell's affidavit was based on nothing more than uncorroborated anonymous tips and that such information does not form an adequate basis for the issuance of a warrant under *Gates* and its progeny. 462 U.S. at 233 (replacing two-prong test with a "totality of the circumstances" approach for determining if an informant's tip established probable cause). The government counters that Howell's affidavit appropriately incorporated his past personal experience of having seized marijuana from the property in question in 2002 to corroborate the more recent anonymous tips. To some extent, we think, both parties' assertions have merit.

---

[6]It is "well established that the prevailing party below need not cross-appeal to entitle him to support the judgment in his favor on grounds expressly rejected by the court below." *Swarb v. Lennox*, 405 U.S. 191, 202 (1972) (White, J., concurring) (citing *Walling v. Gen. Indus. Co.*, 330 U.S. 545 (1947)). Because the Ritters have attacked on appeal the District Court's reasoning, not the result achieved, they are not barred from re-visiting the probable cause issue here. *See Mass. Mut. Life Ins. Co. v. Ludwig*, 426 US 479 (1976).

On the one hand, a warrant may issue even in the absence of direct, first-hand evidence. *See United States v. Burton*, 288 F.3d 91, 103 (3d Cir. 1992) (noting that "direct evidence linking the residence to criminal activity is not required to establish probable cause"); *United States v. Jones*, 28 V.I. 375, 994 F.2d 1051, 1056 (3d Cir. 1993) ("While ideally every affidavit would contain direct evidence linking the place to be searched to the crime, it is well established that direct evidence is not required for the issuance of a search warrant."). *Gates* requires that a court considering the sufficiency of an agent's affidavit look at the "totality of the circumstances," and, in employing this flexible standard, the Supreme Court has explained that the "task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* at 238-39 (citations omitted). In other words, an issuing court need only conclude that it would be reasonable to seek the sought-after objects in the place designated in the affidavit; a court need not determine that the evidence is in fact on the premises. *See Conley*, 4 F.3d at 1205 ("Keeping in mind that the task of the issuing magistrate is simply to determine whether there is a 'fair probability that contraband or evidence of a crime will be found in a particular place' . . . a reviewing court is to uphold the warrant as long as there is a substantial basis for a fair probability that evidence will be found.") (quoting *Gates*, 462 U.S. at 238)).

- 14 -

On the other hand, however, in *Alabama v. White*, 496 U.S. 325 (1990), where the Supreme Court adopted the "totality of the circumstances" test to determine whether an anonymous tip could provide reasonable suspicion for a *Terry* stop,[7] the Court stressed two factors: (1) an officer's ability to corroborate significant aspects of the tip, and (2) the tip's ability to predict future events. Where corroboration or independent investigation after receipt of an anonymous tip is lacking – and thus the predictive value of the tip goes untested before a warrant is issued – courts have found officers' subsequent reliance on the warrant unreasonable. *See, e.g, United States v. Wilhelm*, 80 F.3d 116, 121-22 (4th Cir. 1996) (reliance unreasonable because magistrate acted as rubber stamp by approving "bare bones" affidavit based solely upon uncorroborated anonymous tip); *United States v. Weaver*, 99 F.3d 1372, 1380 (6th Cir. 1996) (reliance unreasonable because detective had no personal knowledge of unlawful activity, did not conduct any visual reconnaissance of area, had only third-party hearsay information on marijuana-growing operation on property, and detective executed warrant himself).

Here, like the officer-affiants in these cases, Officer Howell, after receiving an anonymous tip call, made no attempt

---

[7]A *Terry* stop, of course, requires only reasonable suspicion, *see Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968), a less demanding level of suspicion than is required to establish probable cause.

- 15 -

to verify the informant's allegations through further independent investigation. But, unlike the officers in those cases, Howell did have arguably relevant previous experience with the property in question and included this "historical information [regarding] the previous seizure in August 2002" in his affidavit. The question is whether this experience was sufficiently corroborative so as to give the tip predictive value. It could be said that the connection to the previous raid was tenuous in terms of actual corroboration – it occurred seven months before, the marijuana was being grown in the stable area, the person apprehended was the gardener who apparently did not live on the premises, and there appears to have been no direct connection to the house or its inhabitants. However, Officer Howell's previous observation, the similarity of the type of offense, the fact that the current tip involved both the house and the surrounding outdoor area, and the logical inference that the gardener might have been authorized by the inhabitants of the house to grow the marijuana, all point to the plausible relationship between the previous event and the tip. We can see how an officer and a magistrate could view the tip as establishing an identifiable pattern of activity on the premises.

This is a close case. Were we reviewing the magistrate's decision *de novo*, we might reach a different result. However, the Supreme Court has charged us, when reviewing the sufficiency of an affidavit and resulting warrant, not to engage in "after-the-fact scrutiny" that "take[s] the form of *de novo* review." *Gates*, 462 U.S. at 235. Moreover, we review for a

"substantial basis" for concluding that probable cause existed, *id.* at 236 (citation omitted), which is one step removed from a directed probable cause inquiry applicable when reviewing warrantless stops and searches.[8] Here, the deferential standard with which we view the magistrate's initial probable cause determination tips the scale in favor of determining that the magistrate had a "substantial basis" for finding probable cause existed. In so concluding, we are mindful of the Supreme Court's consistent admonitions over the course of the last half century regarding our preference for warrants and the nature of our task in reviewing warrants issued by judicial officers:

> The point of the Fourth Amendment . . . is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive

---

[8] Judge Smith raises excellent questions regarding the reliance Officer Howell placed on anonymous tips which we might find persuasive if we were conducting a *de novo* review for probable cause as was the situation, for example, in the case Judge Smith finds analogous, *United States v. Roberson*, 90 F.3d 75, 77 (3d Cir. 1996). However, we are reviewing *deferentially* for *substantial basis* for a magistrate's conclusion that probable cause existed.

enterprise of ferreting out crime. Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers. . . . When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or government enforcement agent.

*Johnson v. United States*, 333 U.S. at 13-14.

A magistrate's "determination of probable cause should be paid great deference by reviewing courts." *Spinelli* [*v. United States*, 393 U.S. 410, 419 (1969)]. "A grudging or negative attitude by reviewing courts toward warrants," is inconsistent with the Fourth Amendment's strong preference for searches conducted pursuant to a warrant; "courts should not invalidate [warrants] by interpreting [affidavits] in a hypertechnical, rather than a commonsense, manner."

*Gates*, 462 U.S. at 236 (quoting and *United States v. Ventresca*, 380 U.S. 102, 108, 109 (1965)). The Supreme Court has clearly indicated that the conclusions of a neutral magistrate regarding

probable cause are entitled to a great deal of deference by a reviewing court, and the temptation to second-guess those conclusions should be avoided. *Gates*, 462 U.S. at 236. Accordingly, we find the issuance of the warrant to have been proper. Acknowledging the susceptibility to attack of anonymous tips when dissected *de novo* – as Judge Smith forcefully urges – we note that even if the issuance of the warrant were faulty under the appropriate standard, Officer Howell's reliance on it is clearly not subject to attack, *United States v. Leon*, 468 U.S. 897 (1984), as Judge Smith readily concedes.

## 2. Particularity Requirement

Apart from requiring probable cause, the warrant clause of the Fourth Amendment also unambiguously requires that warrants must particularly describe "the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The particularity requirement not only prevents general searches, but also "assures the individual whose property is searched or seized of the lawful authority of the executing officer, his need to search, and the limits of his power to search." *United States v. Chadwick*, 433 U.S. 1, 9 (1977) (citation omitted).

Here, relying on the Supreme Court's decision in *Maryland v. Garrison*, the District Court concluded that the government's discovery of multiple dwellings on defendants'

property retroactively invalidated the warrant – in essence, rendered the warrant defective from the start for failure to particularize the place to be searched. While we agree that *Maryland v. Garrison* controls the instant issue, we disagree with the District Court's interpretation and use of that case to grant defendants' motion.

In *Garrison*, Baltimore police officers obtained and executed a warrant to search the person of Lawrence McWebb and "the premises known as 2036 Park Avenue third floor apartment." *Id.* at 80. When the police applied for the warrant and when they conducted the search pursuant to the warrant, they reasonably believed that there was only one apartment on the premises, McWebb's, located on the third floor as described in the warrant. A preliminary investigation had been undertaken, which included making calls to the utility company to confirm that the third floor had only one dwelling. *Id.* In fact, the third floor was divided into two apartments, one occupied by McWebb and one by Garrison. When police arrived at the vestibule of the third floor of the building to execute the warrant to search McWebb's apartment, they were able to see into both McWebb's apartment to the left and Garrison's to the right, as the doors to both were open. It was only after Garrison's apartment was entered and contraband had been discovered that any of the officers realized that the third floor contained two apartments; up until that point, all of the officers reasonably believed that they were searching McWebb's

- 20 -

apartment. "As soon as they became aware of that fact, the search was discontinued." *Id.* at 79.

At the outset, the *Garrison* Court noted that "the case presents two separate constitutional issues, one concerning the validity of the warrant and the other concerning the reasonableness of the manner in which it was executed." 480 U.S. at 80. In the case before us, the District Court concluded that the officers' discovery of multiple units inside defendants' residence retroactively invalidated the warrant for lack of particularity. "Once the police officers realized the building was a multi-unit dwelling, the Court holds that the search warrant was defective for failing to specify which unit(s) were to be searched." But, in *Garrison*, the Supreme Court directs us to perform a different analysis. In fact, it rejects the concept of retroactive invalidity that was the basis for the District Court's order granting defendants' suppression motion and instructs us, instead, to examine the reasonableness of the warrant's execution.

Similar to the circumstances present in *Garrison*, here, there came a point in the execution of the warrant when the officers "[w]ith the benefit of hindsight [knew] that the description of [the place to be searched] was broader than appropriate because it was based on the mistaken belief that there was only one [dwelling on defendants' property]." *Garrison*, 480 U.S. at 85. "The question is whether that factual mistake invalidated a warrant that undoubtedly would have been

- 21 -

valid if it had reflected a completely accurate understanding of the building's floor plan." *Id.* Considering this question, the Supreme Court answered in the negative, emphasizing that the constitutionality of police officers' conduct in the execution of the warrant – not the validity of the warrant – is the crucial issue, and it must be judged "in light of the information available to them at the time they acted." *Id.*

> Those items of evidence that emerge after the warrant is issued have no bearing on whether or not a warrant was validly issued. Just as the discovery of contraband cannot validate a warrant invalid when issued, so is it equally clear that *the discovery of facts demonstrating that a valid warrant was unnecessarily broad does not retroactively invalidate the warrant*. The validity of the warrant must be assessed on the basis of the information that the officers disclosed, or had a duty to discover and to disclose, to the issuing Magistrate.

*Id.* (footnote omitted) (emphasis added). The *Garrison* Court thus concluded that a search warrant, "insofar as it authorize[s] a search that turn[s] out to be ambiguous in scope," will, nevertheless, be upheld against a particularity challenge if the warrant described the structure as it was known or should have been known to the officers after reasonable inquiry under the circumstances. *Id.* at 86. Therefore the District Court's

- 22 -

suppression order cannot be upheld on the basis of its proffered reasoning that the officers' discovery of multiple units within the residence invalidated the warrant. Accordingly, as directed by *Garrison*, we must evaluate the officers' conduct in carrying out the warrant.

### 3. Execution of the Warrant

Although the officers lawfully embarked upon the search of the premises with a warrant supported by probable cause, did there come a time when their execution went beyond what the warrant permitted and, thus, ran afoul of the Fourth Amendment's prohibition of unreasonable searches? *Garrison* necessarily informs this inquiry. From the Supreme Court's opinion in that case, several relevant principles can be distilled, all of which focus on the conduct of a reasonable officer and the reasonableness of his belief as to whether the search at issue is proceeding beyond the four corners of the warrant.

First, if the officers had known, or should have known, that there were separate dwellings contained in the property pictured in Attachment "A" to Officer Howell's affidavit, they would have "been obligated to exclude [those areas for which probable cause was not established] from the scope of the requested warrant." 480 U.S. at 85. Officer Howell testified that the multi-unit nature of defendants' residence was not known to officers prior to execution of the warrant. Second, mere entry into the building's common areas was reasonable and

lawful because the officers carried a valid warrant authorizing entry upon the premises. *Id*. at 86. As discussed above, the warrant to search defendants' residence was valid and it is undisputed that the warrant was directed specifically toward the property that officers did in fact enter. Third, once the officers knew or should have known of the error in what they encountered versus what was authorized by the warrant, they were obligated to either limit the search to those areas clearly covered by the warrant or to discontinue entirely their search. *Id.* at 87.[9] Here, notwithstanding their discovery of multiple

---

[9]Insofar as the warrant at issue in *Garrison* named an individual as opposed to merely listing an address, the facts of our case clearly differ. Under the facts of *Garrison*, the Supreme Court recognized that officers, depending upon when the error is discovered, will either have to limit their search (which assumes the warrant's mistake is noticed before entry into an unrelated area) or discontinue the search (assuming, as was the case in *Garrison*, that officers have already mistakenly undertaken a search of premises outside the scope of the warrant). In the instant case, where there are multiple defendants and generalized probable cause to search a property as opposed to a specific individual's apartment, the lines are not so clearly delineated. *See People v. Luckett*, 273 Ill. App. 3d 1023, 1028 (1995) ("[T]he probable cause requirement would be rendered virtually meaningless if police could legally search several living units upon a mere showing that one of the units, not specifically identified, contained the contraband sought.") (citing *United States v. Busk*, 693 F.2d 28 (3d Cir. 1982)).

- 24 -

units, the officers did not limit or discontinue their search. This does not necessarily, however, result in suppression of all physical evidence discovered during the course of the entire search. The *Garrison* Court's ultimate directive remains salient: "The officers' conduct and the limits of the search [are] based on the information available as the search proceed[s]." *Id.* This principle, along with a recognition of "the need to allow some latitude for honest mistakes that are made by officers in the dangerous and difficult process of making arrests and executing search warrants," *Garrison*, 480 U.S. at 87 (footnote omitted), is what must guide us in determining if and when the execution went awry.

The government argues that any evidence discovered before the realization by officers that defendants' residence comprised multiple units should not be suppressed but concedes that "once the officers discovered that the house had multiple dwelling units, they could no longer rely on the warrant to justify their search of the building." (Brief of Appellant at 17.)[10] We agree. However, the government itself points out, "It is not clear from the record [] what evidence apart from the two marijuana-growing rooms and mini-14 assault rifle was

---

[10]Nevertheless, the government states that it is preserving its right to argue on remand that some exception to the warrant requirement, such as exigent circumstances, justified the continued search of defendants' individual apartments. (Brief of Appellant at 17.)

discovered in the house *before* the officers realized that the house had multiple dwelling units." (Brief of Appellant.) Again, we agree, but would go further, as we are not even certain that the evidence to which the government refers was viewed before the officers realized they were in a multi-unit property. The District Court's order granting defendants' suppression motion does not include any factual findings on which we could make such a determination on appeal. Nor does our reading of the cold record elucidate exactly what happened, and when, during the execution of the warrant. That which the District Court finds that members of the entry team observed in the shared or common areas of defendants' residence – before they concluded that the residence actually comprised multiple apartments – will dictate what evidence, if any, should avoid suppression.[11] We cannot discern such determinative facts from the record, and we will REMAND to the District Court for further fact-finding in this regard.

---

[11]In addition, although the entry teams' function was to sweep the premises to determine whether any persons were present, rather than conduct a thorough search for contraband, certainly team members were not oblivious to evidence in plain view. For example, two weapons were seized from Ernie Ritter's apartment – one from the closet, which clearly should be suppressed, and one that was either laying on the bed or hanging on the bedpost, which might have been plainly visible to officers from a lawful vantage point and thus would not necessarily require suppression.

However, just as "we do not supply the testimony that the government failed to elicit during the suppression hearing," *United States v. Myers*, 308 F.3d 251, 255 (3d Cir. 2002), the government should not be afforded a second opportunity to carry its burden that the challenged evidence should not be suppressed. Accordingly, the government must live with its decision to offer only one witness – Officer Howell – to make a record of the events of May 8, 2003. Based on his testimony, and that of defendants' witness, Andre Peterson, the District Court, assuming it can do so from the evidence already before it, must make factual findings consonant with both the Supreme Court's decision in *Garrison* and this opinion. Should the District Court need further elucidation or clarification, however, in light of our analysis and given the passage of time, it may on remand request that the witnesses previously called testify once again in order for the Court to make the requisite findings.

### 4. Other Evidence Seized and Suppressed

We now turn to the additional conclusions of law made by the District Court regarding defendant Dale Ritter's claims that 1) the scope of the search warrant was exceeded by the government's search of his oven and broiler and 2) he should not have been patted down absent reasonable suspicion that he was armed and dangerous. As to the first claim, the District Court determined that the issue was moot based on its conclusion that the entire search was unlawful. Under *Garrison*, however, only that evidence seized after officers have

discovered the multi-unit character of the premises should be suppressed. Here, again, we need the District Court to make factual findings. Officer Howell testified that "there was a trail of the marijuana leading from the front of the residence to the oven," but, when counsel asked him if that trail was what led officers to look in the broiler for money, Officer Howell reiterated, "Again, I didn't search it, the agent that did would be better, be a better one to ask these questions." We will REMAND for the District Court to make findings and render conclusions on this issue based on the evidence presently in the record and Officer Howell's credibility.

Second, the District Court agreed with defendant Dale Ritter that the marijuana discovered on his person as a result of a patdown should be suppressed. The Court reasoned that, under *Ybarra v. Illinois*, 444 U.S. 85, 92-93 (1979), the officers needed reasonable suspicion that Dale Ritter was armed and dangerous, of which the government offered no proof. In *Ybarra*, police officers, who had obtained a warrant to search a tavern and its owner for evidence of drugs, announced upon entering the tavern that all present would be subject to a "cursory search for weapons." 444 U.S. at 88. One of the officers frisked the defendant and felt "a cigarette pack with objects in it"; after frisking other patrons, the officer returned to the defendant, removed the cigarette pack from defendant's pocket and found it to contain heroin. *Id.* at 88-89. In reviewing the constitutionality of the defendant's patdown, the Supreme Court explained:

- 28 -

The *Terry* case created an exception to the requirement of probable cause, an exception whose "narrow scope" this Court "has been careful to maintain." Under that doctrine a law enforcement officer, for his own protection and safety, may conduct a patdown to find weapons that he reasonably believes or suspects are then in the possession of the person he has accosted. Nothing in *Terry* can be understood to allow a generalized "cursory search for weapons" or, indeed, any search whatever for anything but weapons. The "narrow scope" of the *Terry* exception does not permit a frisk for weapons on less than reasonable belief or suspicion directed at the person to be frisked, even though that person happens to be on premises where an authorized narcotics search is taking place.

*Id.* at 93-94 (footnote and citation omitted).[12] At the suppression hearing in this case, Office Howell testified that when people are encountered on the premises of property to be searched during the course of executing a search warrant, usually they are "secured" and "padded [sic] down for weapons" primarily to ensure officers' safety. Though he was not in the area where Dale Ritter was apparently patted down, which Officer Howell described as "more towards the front," Howell testified that he assumed Dale Ritter had been patted down for this reason. Under *Ybarra*, this "cursory search for weapons" clearly is not permitted absent a reasonable belief or suspicion that an individual encountered is armed, 444 U.S. at 88, 96. Therefore, the evidence discovered on Dale Ritter's person should be suppressed. *See also Doe v. Groody*, 361 F.3d 232, 243 (3d Cir. 2004) ("A search warrant for a premises does not constitute a license to search everyone inside."). We will AFFIRM this aspect of the District Court's order.

---

[12]In so concluding, the Supreme Court also rejected the government's alternative argument that, based on governmental interest in "effectively controlling traffic in dangerous, hard drugs," the *Terry* "reasonable belief or suspicion" standard should be made applicable "to aid the evidence-gathering function of the search warrant" such that persons present on "compact" areas to be searched can be searched for drugs based on reasonable suspicion they are somehow connected with drug trafficking. *Ybarra*, 444 U.S. at 343-44 (citing *United States v. Di Re*, 332 U.S. 581, 583-587 (1948)).

- 30 -

Finally, the government argues that evidence seized from "the stable" and "elsewhere on the grounds" was lawful notwithstanding the discovery of multiple units inside the house. (Brief of Appellant at 17.) Because the record is devoid of details concerning the discovery of this additional evidence, we will REMAND for further fact-finding by the District Court.

### III. CONCLUSION

The search undertaken in reliance on the warrant issued was reasonable. Notwithstanding the subsequent discovery of a factual mistake in the warrant concerning the number of individual dwellings comprised by the residence, under *Maryland v. Garrison*, the warrant was not defective for lack of particularity

However, we will REMAND this case for further fact-finding relating to the government's execution of the warrant. Although it is clear that law enforcement officers did not limit or discontinue their search of defendants' individual apartments as *Garrison* would require, certain evidence observed as a result of officers' valid entry onto the premises may be admissible if the District Court can make findings as to evidence observed before entry into individual apartments – whether in common areas or pursuant to the plain view doctrine – while the police had a reasonable belief that the search was in compliance with the warrant.

Additional fact-finding is also required to resolve both the discovery of contraband outside the residence – in the stable and "elsewhere on the grounds," and Dale Ritter's claim that evidence seized from his oven and broiler should be suppressed.

We will AFFIRM the District Court's determination that the marijuana discovered on Dale Ritter's person pursuant to a patdown should be suppressed under *Ybarra v. Illinois*.

_____

SMITH, *Circuit Judge*, dissenting in part and concurring in the judgment.

Because I believe that even under a deferential standard of review, the magistrate judge's probable cause determination should not stand, I dissent from the portion of the majority's opinion validating the issuance of the warrant. However, because under the rule of *United States v. Leon* Officer Howell could reasonably rely on the invalid warrant, I reach the same result as the majority: Before they discovered that the building to be searched contained multiple apartments, the conduct of Howell and the other warrant-executing officers did not violate the Fourth Amendment.

Unlike the majority, I do not view this as a "close case," where our deferential review "tips the scale in favor" of validating the magistrate's finding of probable cause. This is not a marginal case of probable cause that should be governed by a preference for warrants. *See United States v. Ventresca*, 380 U.S. 102, 109 (1965). Rather, under the precedent of the Supreme Court and this Court, I am doubtful that the affidavit even supports a finding that reasonable suspicion existed, much less probable cause. In my view, the majority's analysis in concluding that the warrant was properly issued is flawed in two ways. First, the majority does not discount for staleness the information contained in Howell's May 2003 affidavit regarding

the August 2002 eradication project.   Second, and more fundamentally, by crediting Howell's supposed corroboration of a "bare bones" anonymous tip – i.e., a tip consisting only of conclusory allegations of illegality – the majority misapplies the anonymous tip jurisprudence of the Supreme Court and this Court, and misconceives the role corroboration plays in evaluating such tips.   Both of these factors weigh strongly against the magistrate's probable cause determination.

**Staleness**

The majority does not confront the fact that by the time of the first anonymous tip, Howell's information from the August 2002 marijuana eradication effort had aged eight months.  The staleness of this information renders it of minimal probative value.

It is well-established that staleness is a contextual inquiry and not simply a matter of measuring the age of information contained in an affidavit. *United States v. Harvey*, 2 F.3d 1318, 1322 (3d Cir. 1993) (noting that the speed with which information supporting a warrant becomes stale varies with the nature of the crime and the type of evidence); *United States v. Williams*, 897 F.2d 1034, 1039 (10th Cir. 1990).  By the same token, staleness implies no frontier between full-potency fresh information and the worthlessly stale. With half-lifes varying by context, the reliability of information dissipates over time to the point that such information must be disregarded.  For instance,

information regarding an alleged burglar's possession of readily fenced music CDs will dissipate faster than, say, an alleged burglar's possession of a stolen Cezanne painting that may take the suspected thief years to unload. Further, we have recognized, quite sensibly, that information regarding repeated unlawful conduct over an extended period suggests a "continuing offense," and thus is more durable than information of discrete offenses. *United States v. Urban*, 404 F.3d 754, 774 (3d Cir. 2005) ("[W]here the facts adduced to support probable cause describe a course or pattern of ongoing and continuous criminality, the passage of time between the occurrence of the facts set forth in the affidavit and the submission of the affidavit itself loses significance."); *United States v. Zimmerman*, 277 F.3d 426, 434 (3d Cir. 2002).

Here, the information Howell used to corroborate the anonymous tip was weak as an initial matter,[13] and the nature of

---

[13] As the majority notes, Howell saw the area in question one time from a helicopter, approximately eight months before submitting his affidavit. The one person interviewed by the officers on the ground in August 2002, the marijuana cultivator, denied living in the house, and no connection between the main building and the marijuana growing in the roofless horse stables or in the field was ever made. Both the horse stables and the field are described in Howell's affidavit as being "at the rear" of the main house. Where, if at all, the roofless stables appear in the aerial photograph ("Attachment A" to the affidavit) is

- 35 -

the crime and type of evidence indicates that the information was susceptible to becoming stale.

First, Howell saw marijuana growing on the property on one occasion. By definition, one sighting cannot constitute a "continuing offense" such that the information would become stale at a relatively slow rate. *Compare Zimmerman*, 277 F.3d at 434 (concluding that one viewing of a pornographic video clip ten months before rendered the information stale), *with Urban,* 404 F.3d at 775 (determining that a years-long pattern of graft and extortion, the last evidence of which was from October 1999, was not stale at the time of a February 2000 affidavit), *and Harvey*, 2 F.3d at 1323 (concluding that information concerning the receipt of fifteen child pornography mailings over a period from two to fifteen months before the warrant application was made was not stale). The August 2002 discovery of an outdoor grow operation was a discrete event, and the marijuana was destroyed. To be sure, one may speculate that marijuana is more likely to be regrown in the same location where it has been found than in a place where it has never been discovered. However, Howell's affidavit contains no information that marijuana was repeatedly grown at the location, and it is equally sensible to posit that people will not again cultivate marijuana in a location already known to authorities.

---

unknown. At best, the connection between the outdoor marijuana grow operation and the nearby building must be imputed, and thus was tenuous even in August 2002.

Because there was no pattern of illegality here, I believe the information from the August 2002 eradication effort had become stale by the time Howell included it in his May 2003 affidavit.

Second, not only was no connection between the outdoor grow operations and the main house made in August 2002, even if one were to infer such a connection then existed, Howell made no effort to determine whether there was a continuity of ownership or occupancy of the property. What the majority terms "Ritters' property," *ante* n.1 – a fair enough characterization in May 2003 considering the Ritters' residency if not ownership of the compound – may have been no such thing in August 2002. There was simply no investigation of (1) who, if anyone, lived in the building (or who owned it) at the time of the August 2002 marijuana eradication; (2) whether the occupants or owners of the building were connected to the August 2002 outdoor marijuana growing; or (3) whether any changes in occupancy or ownership had occurred between August 2002 and May 2003. Moreover, apart from the anonymous tips, Howell had no evidence that the building ever housed an indoor marijuana growing operation. Any connection between the outdoor grow operation and an indoor grow room must be imputed. Yet, the majority transports across the eight-month interim the connection they necessarily draw between the illicit outdoor activity and that suspected to have occurred indoors in August 2002. In my view, the connection between the outdoor marijuana cultivation and that which the majority

presumes to have occurred indoors was weak in 2002, and was worthlessly stale by May 2003. People are mobile. Real property changes hands.

**Corroboration of Anonymous Tips**

In *Illinois v. Gates*, 426 U.S. 213 (1983), the Supreme Court stressed that, unlike tips from known informants who have provided reliable information in the past, or tips from identified citizens who could be charged with filing a false report if the tip proved faulty, the veracity and reliability of anonymous tipsters is "by hypothesis largely unknown, and unknowable." *Id*. at 237. *Gates* also observed that the same deficiency obtains regarding the means by which an anonymous informant came by the information contained in a tip, what the Court termed the "basis of knowledge."[14] *Id*. at 246. In

---

[14] In *Gates*, the Supreme Court incorporated the reasoning of its decisions in *Aguilar v. Texas*, 378 U.S. 108 (1964), and *Spinelli v. United States*, 393 U.S. 410 (1969), into a totality-of-the-circumstances approach for evaluating informants' tips. *Gates* eschewed a stovepipe approach that treats an informant's "veracity," "reliability," and "basis of knowledge" – criteria developed in *Aguilar* and *Spinelli* – as independent and necessary elements to crediting tips. Rather, in affirming the *Aguilar* and *Spinelli* criteria as relevant indicia of a tip's value, the Court established that the inquiry should treat these criteria as related issues, such that "a deficiency in one may be compensated for, in determining the overall reliability of a tip,

expounding on the "veracity," "reliability," and "basis of knowledge" inquiries, *Gates* and its progeny distinguish between anonymous tips that contain detailed predictions of the target's future activities from those that merely assert criminal wrongdoing occurring in the past or at the time of the tip.

In the former category, the cases allow that police corroboration of the tip's predictions regarding the target's future lawful actions can bolster the tip's creditability, and may create the reasonable suspicion or probable cause needed to support a seizure and search of the target and his property for evidence of illegal activity. The rationale of these decisions is that if the anonymous tip proves correct about the target's predicted licit actions "A, B, and C," then the tip's prediction that the target will be engaged in illegal activity "D" is more creditable. *Id.* at 244; *see Spinelli v. United States*, 393 U.S. 410, 427 (1969) (White, J., concurring) ("[B]ecause an informant is right about some things, he is more probably right about other facts, usually the critical, unverified facts."). The police corroboration of the anonymous tip's innocent details, the cases teach, bolsters the veracity and reliability of the tip, as well as suggests that the tipster is a trusted intimate of the target,

---

by a strong showing as to the other, or by some other indicia of reliability." *Gates,* 462 U.S. at 233.

and thus may be privy to inside information concerning the target's alleged lawbreaking.

Where the anonymous tip contains only "bare bones" allegations of illegality, however, the police have no basis on which to evaluate the creditability of the tip's illegal content by corroborating the tip's predictions of the target's future innocent actions. Such conclusory anonymous tips do not amount to reasonable suspicion, much less probable cause, and police may not base a seizure or search on them.[15] As with predictive tips, a "bare bones" anonymous tip can trigger a police investigation, such as placing surveillance on the tip's target, that may reveal independent suspicious activity upon which the police can then act. With nothing but the illegality to verify, however, the investigation of conclusory allegations itself must reveal suspicious activity independently sufficient to support a seizure and search.

Here, the anonymous tips contained only bare allegations of illegality – that the residents of the identified building were cultivating marijuana in two outdoor locations and in two indoor

---

[15] The Supreme Court has suggested that police may rely on an anonymous tip to conduct a seizure and search on the tip's target if the danger alleged is great, such as a bomb threat. *Florida v. J.L.*, 529 U.S. 266, 273-74 (2000). However, as here, anonymous tips regarding narcotics do not constitute such a special circumstance.

grow rooms, and that an occupant of the house was seen carrying marijuana plants inside the building. The tips contained no predictions of innocent activity Howell could corroborate to bolster the tip's overall reliability; there was nothing to corroborate except for the illegal activity itself. Yet, the majority, relying on inapposite "predictive anonymous tip" caselaw, erroneously concludes that Howell's viewing of outdoor marijuana growing near the building eight months earlier somehow "corroborated" the anonymous tip. I disagree with this approach, and I believe it is unprecedented, because it substitutes Howell's prior knowledge for any testing of the reliability and basis of knowledge of the tipster and her information. This strikes me as a fundamental error with potentially dangerous implications. The Supreme Court has analyzed anonymous tips three times, and in each case the Court has emphasized the tip's accuracy in predicting future events as a means of assessing its overall credibility. The tip here predicted nothing that could be verified, so when the warrant issued, the predictive value of the tip was nil.

*Predictive Anonymous Tip Cases*

The Supreme Court in *Gates* emphasized the value of the independent police investigation in corroborating the details of the Gateses' narcotics run as predicted in an anonymous letter. By the time he had submitted his affidavit to the magistrate, the officer in *Gates* had corroborated several of the predictions contained in the letter, including Lance Gates' flight from

- 41 -

Chicago to West Palm Beach, Florida, his collecting the family car there, and his quick departure driving back north. *Gates*, 426 U.S. at 244. That the anonymous letter had correctly predicted these innocent facts, the Court reasoned, increased the reliability of the tipster's prediction that the trunk of the car would contain marijuana. *Id.*

Similarly, the basis of knowledge of the anonymous letter writer was unassessable before the details were corroborated. As to this criteria, *Gates* distinguished between "easily obtained facts and conditions existing at the time of the tip," which are deprecated, and predicted future events that only an intimate of the tip's target would know, about which corroboration of innocent details by police investigation can bolster the probability that the tip's content concerning illegality is accurate. *Id.* at 244-46. That several of the letter's predictions of the Gateses' unusual travel plans proved true increased the probability that the letter contained information known only to the Gateses themselves or a trusted intimate of theirs, namely, that they were transporting marijuana in the trunk of their car. *Id.* at 246. Noting the substantial corroboration of difficult-to-predict details contained in the letter, and observing that the Gateses' actions were "as suggestive of a prearranged drug run, as it [was] of an ordinary vacation trip," the Court held that the magistrate had a proper basis for issuing the warrant. *Id.* at 243-46.

*Gates* highlights the illogic of the majority's reliance here on Howell's *ex ante* "corroboration" of the anonymous tip to justify the issuance of the search warrant: The majority credits the anonymous tip at face value in its probable cause calculus without requiring that its veracity, reliability, or basis of knowledge be vetted at all. Indeed, quoting *Gates*, the majority mentions "basis of knowledge" as a factor in a magistrate's "practical, common-sense" probable cause decision, yet never returns to apply it to the facts of this case.

In *Alabama v. White*, 496 U.S. 325 (1990), the Supreme Court applied its anonymous tip analysis from *Gates* in a reasonable suspicion context. The anonymous tip in *White* indicated that, at a given time, Vanessa White would drive a brown Plymouth station wagon with a broken taillight from her apartment on a direct route to Dobey's Motel, and that White would be in possession of a brown attache case containing marijuana and heroin. *Id.* at 326. Following up on the tip, the police located the station wagon at the address given, and observed a woman enter it and begin driving toward Dobey's Motel within the time frame predicted. *Id.* at 331. As the vehicle neared the hotel, the police effected a *Terry* stop of the car, and a consent search of the attache case found inside revealed narcotics. *Id.* at 326.

Applying the same approach in the reasonable suspicion context as it did in *Gates'* probable cause analysis, the Court again stressed the importance of personal observations by

officers in corroborating some predictions of lawful behavior contained in the anonymous tip to establish the reliability of the tip's information concerning the target's alleged illegal activities. *Id.* at 331-32 (noting that *Gates* credited "the proposition that because an informant is shown to be right about some things, he is probably right about other facts that he has alleged, including the claim that the object of the tip is engaged in criminal activity," and concluding that "the independent corroboration by the police of significant aspects of the informer's predictions imparted some degree of reliability to the other allegations made by the caller"). Likewise, *White* iterated *Gates'* teaching that police confirmation of a tip's hard-to-predict details helps to establish the "insider" basis of the informant's knowledge. *Id*. at 332 ("When significant aspects of the caller's predictions were verified, there was reason to believe not only that the caller was honest but also that he was well informed, at least well enough to justify the stop.").[16] The

---

[16] Also, as it did in *Gates*, the Court again distinguished between "easily obtained facts and conditions existing at the time of the tip" and "future actions of third parties not easily predicted." *White*, 496 U.S. at 332 (quoting *Gates*, 462 U.S. at 245). The Court noted that anyone could have "predicted" that the station wagon was parked at a given location because it was a condition presumably existing at the time of the anonymous phone tip. *White*, 496 U.S. at 332. In the Court's view, "[w]hat was important was the caller's ability to predict [White's] future behavior, because it demonstrated inside information – a special

Court considered *White* to be a "close case," but that "under the totality of the circumstances the anonymous tip, as corroborated, exhibited sufficient indicia of reliability to justify the investigatory stop of [White's] car."[17] *Id*.

Illustrating the difference between the probable cause and reasonable suspicion standards, *White* noted that the tip at issue was not as detailed, and the corroboration was not as thorough,

---

familiarity with respondent's affairs." *Id.* Here, the anonymous tips lacked any predictive information whatsoever, the corroboration of which could have augmented the tips' creditability.

[17] The government cites a predictive anonymous tip case, *United States v. Padro*, 52 F.3d 120 (6th Cir. 1995), for the proposition that a law enforcement officer may use information he already possesses to corroborate an anonymous tip, and thus justify a search requiring probable cause. Tellingly, the Sixth Circuit in *Padro* specifically noted that before the search took place the officer had corroborated the informant's predictions regarding the vehicle used and its route, timing, and occupants. *Id.* at 123. Moreover, during the stop, the officer had seen a protruding armrest panel and electronic release hook in plain view, suggesting the hidden recess predicted in the tip. *Id.* at 124. In short, several aspects of the informant's tip were verified before the search, thus the *Padro* court held that probable cause existed to search for the narcotics the anonymous tipster alleged were being transported.

as in *Gates*, but that the less demanding reasonable suspicion standard lowers the sum of the quantity and quality of the information that must be established. *Id.* at 330. Also, unlike in *Gates*, White's predicted activities were not independently suspicious. Though it was a borderline case, the Court concluded that the police had the reasonable suspicion necessary to effect the traffic stop.

Here, the majority notes that the Supreme Court in *White* stressed that an officer's ability to corroborate a tip, and the tip's predictive ability, are the two most important considerations in the totality of the circumstances inquiry used to determine whether an anonymous tip could provide the reasonable suspicion necessary to support a *Terry* stop. Despite observing that reasonable suspicion requires a lesser quantum of proof than the probable cause standard here, and despite noting that "the predictive value of the tip [went] untested" before the warrant issued, the majority still refuses to upset the magistrate's finding. The majority then frames the question here as whether Howell's August 2002 experience "was sufficiently corroborative so as to give the tip predictive value."

The fundamental error the majority makes is that it fails to recognize that there is absolutely nothing "predictive" about the anonymous tip in this case to corroborate, as that term is understood in the caselaw. Because the basis of the tipster's knowledge was not and could not be tested to show that she likely was indeed an insider, and because the veracity and

reliability of the tip's substance was not and could not be corroborated (i.e., there was no innocent prediction of "A, B, and C" that, if corroborated, would provide a substantial basis to conclude that prediction "D" of illegal activity was also accurate), the magistrate was not permitted to rely on the anonymous tip in its probable cause calculus.[18]  In my view, reference to the magistrate's duty to make "practical, common-sense decisions," *Gates*, 462 U.S. at 237, offers no refuge for the legal error evident here.  *See United States v. Leon*, 468 U.S. 897, 915 (1984) ("Even if the warrant application was supported by more than a 'bare bones' affidavit, a reviewing court may properly conclude that, notwithstanding the deference that magistrates deserve, the warrant was invalid because the magistrate's probable-cause determination reflected an improper analysis of the totality of the circumstances... .").  Once the anonymous tip is discredited, all that is left of the affidavit is Howell's sighting and eradication of outdoor marijuana "at the rear" of the building eight months before, and this is not nearly enough to support the probable cause standard for the issuance of a warrant.

*"Bare Bones" Anonymous Tip Cases*

---

[18]  The majority notes, "We can see how an officer and a magistrate could view the tip as establishing an identifiable pattern of activity on the premises."  I submit that under *Leon*, discussed *infra*, Officer Howell is allowed such mistakes, but the magistrate is not.

*Florida v. J.L.*, 529 U.S. 266 (2000), involved an anonymous tip that a young black male wearing a plaid shirt and standing at a particular bus stop was carrying a concealed weapon in violation of Florida law. *Id.* at 268. Acting on this skeletal tip, the police identified the target of the tip and conducted a *Terry* stop-and-frisk of him that revealed a gun. *Id.* Relying almost exclusively on *White*, a unanimous Court invalidated the search. *Id.* at 269. Unlike the post-tip corroboration essential to the *White* decision, the "anonymous call concerning J.L. provided no predictive information and therefore left the police without a means to test the informant's knowledge and credibility." *Id*. at 271. Absent independent corroboration, the police impermissibly relied on the "bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information." *Id.* "If *White* was a close case on the reliability of anonymous tips," the Court concluded, "this one surely falls on the other side of the line." *Id.* It bears repeating that like *White*, *J.L.* was a reasonable suspicion case, not a probable cause case as here.[19]

---

[19] Indeed, the Supreme Court has suggested that an unverified tip from a known, repeat informant alone does not create probable cause. *Adams v. Williams*, 407 U.S. 143, 147 (1972). The verification required to credit an anonymous tip is necessarily greater. *Compare id.* at 146-47 (holding that a tip from a known informant who had provided reliable information in the past was sufficient to support a *Terry* stop-and-frisk for a

In my view, the facts of this case are analogous to those in *United States v. Roberson*, 90 F.3d 75 (3d Cir. 1996) (Becker, J., joined by Nygaard and Lewis, JJ.). There, this Court anticipated the Supreme Court's decision in *J.L.* in concluding that an uncorroborated anonymous tip that contains only information readily observable at the time the tip was made does not justify a *Terry* stop. *Id*. at 80. The *Roberson* tip was that an individual identified by his race, build, clothing, and location was selling drugs on a corner known to police as a "hot spot" for narcotic sales.[20] *Id*. at 75-76. Though brief surveillance revealed no suspicious activity by the identified individual, the police nonetheless conducted a *Terry* stop-and-frisk of the tip's target, and discovered narcotics. *Id*. at 76. We held that reasonable suspicion is lacking where a bare anonymous tip of illegal activity contains only readily apparent information – i.e., the tip does not contain predictive information that, if corroborated, would suggest the source is a reliable intimate of the target – and the police do not themselves observe suspicious

gun), *with J.L.*, 529 U.S. at 274 (distinguishing *Adams* and *White* and concluding that an anonymous tip lacking indicia of reliability does not justify a stop-and-frisk under *Terry*).

[20] I view the "hot spot" characterization in *Roberson* to be of approximately equal weight in the totality-of-the-circumstances analysis as the connection the majority makes between the outdoor marijuana plots eradicated "at the rear" of the main house in August 2002 and the indoor grow operations alleged in the tip to have existed eight months later.

behavior. *Id.* at 80. To hold otherwise, we reasoned, would subject anyone to a search on the "say-so of an anonymous prankster, rival, or misinformed individual."[21] *Id.* at 80-81.

If anything, the major distinguishing features of *Roberson* cut against the majority's validation of the magistrate judge's finding of probable cause here. First, *Roberson* involved merely reasonable suspicion, not probable cause. The majority's validation of the magistrate's probable cause finding threatens to blur the distinction between the two standards by drawing what is needed to establish probable cause toward the lesser standard. Second, as recently as 2001, the Supreme Court has repeated that "the Fourth Amendment 'draws a firm line at

---

[21] As noted by the *Roberson* panel, the police could have placed surveillance on the tip's target on the chance that he would exhibit suspicious behavior to justify a *Terry* stop. *Id*. at 81. The same opportunity was presented here, yet Howell opted not to visit the compound or conduct any investigation before seeking a warrant. Deed and utility searches could have determined continuity or changes in ownership and occupancy across the eight months. A short post-tip visit presumably would have revealed the outdoor plots of marijuana, justifying a warrant for entry onto the property. Further investigation or surveillance by Howell may have produced information properly supportive of a search warrant for the building. At the time the magistrate issued the warrant, however, he had no post-tip qualifying indicia of the tip's overall reliability. That the tip ultimately proved accurate does not matter.

- 50 -

the entrance of the house.'" *Kyllo v. United States*, 533 U.S. 27, 39 (2001) (quoting *Payton v. New York*, 445 U.S. 573, 590 (1980); *see Zimmerman*, 277 F.3d at 431 ("One's home is sacrosanct, and unreasonable government intrusion into the home is 'the chief evil against which the wording of the Fourth Amendment is directed'") (quoting *Payton*, 445 U.S. at 585). By approving the magistrate's probable cause finding on the flimsy showing of Howell's affidavit, the majority guts the warrant requirement it purports to honor, and fails to recognize the status traditionally accorded the home in Fourth Amendment jurisprudence.

*Summary*

By failing to distinguish between predictive anonymous tips and bare bones anonymous tips, the majority misconceives the purpose of corroborating anonymous tips. The purpose is to test the verity of the tipster and his information, not the knowledge of the officer who receives the tip and submits the affidavit to the magistrate. The policy rationale for the distinction is readily understood: Except in cases where the tip involves "great danger," such as a bomb threat, the Fourth Amendment prohibits police from effecting a seizure and search based on anonymous reports of illegal activity.[22] *See J.L.*, 529

---

[22] The majority's mistaken approach raises the spectre of every residence that has been the site of prior illegal activity in recent months being an anonymous tip away from the issuance

U.S. at 272 (refusing to recognize an automatic weapon exception to the reliability analysis because "[s]uch an exception would enable any person seeking to harass another to set in motion an intrusive, embarrassing police search of the targeted person simply by placing an anonymous call falsely reporting the target's unlawful carriage of a gun").  In other words, it is constitutionally unreasonable for police to rely on untested allegations by individuals who are unwilling to reveal themselves; the danger of mischief is simply too great.

**Good Faith Exception of *United States v. Leon***

*Gates'* deference to magistrates' probable cause determinations was premised on the notion that searches pursuant to warrants are preferable to warrantless searches based on exceptions to the Fourth Amendment's warrant requirement. *Gates*, 462 U.S. at 236.  The Court observed that the presence of a warrant during a search "reduces the perception of unlawful or intrusive police conduct, by assuring the individual whose property is searched or seized of the lawful authority of the executing officer, his need to search, and the limits of his power

---

of a search warrant.  Consistent with the majority's reasoning, a magistrate could validly issue a search warrant where an affidavit asserts the combination of an anonymous tip of illegal activity in a certain building with a database "hit" showing that the address had been the site of similar illegality in the past eight months.

to search." *Id.* (citation omitted). Relatedly, the primary purpose of the exclusionary rule is to deter unlawful police conduct, *United States v. Calandra*, 414 U.S. 338, 347 (1974), a purpose that is weakly served, if at all, by severe after-the-fact scrutiny of magistrates' probable cause determinations. *United States v. Leon*, 468 U.S. 897, 919-20 (1984).

Rather than discourage officers from seeking warrants with the prospect of reviewing courts excluding evidence by overturning magistrates' probable cause findings after close scrutiny of these findings, and thereby induce officers to rely on warrant exceptions, *Gates* affirmed the deferential standard that "so long as the magistrate had a 'substantial basis for ... conclud[ing]' that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more." *Gates*, 462 U.S. 236 (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)).

The Supreme Court in *Leon* established a broad good faith exception to the exclusionary rule that allows the introduction of evidence when an officer executes a search in reasonable reliance on a warrant found on review to have been unsupported by probable cause.[23] *Id.* at 922. *Leon* thus enables

---

[23] This Court has recognized four situations in which *Leon* does not apply, but these are minor limitations to the applicability of the rule, and none apply here. *See United States v. Williams*, 3 F.3d 69, 74 (3d Cir. 1993) (quoting the

appellate courts to instruct magistrates on the contours of the probable cause requirement without discouraging conscientious officers from seeking warrants, and it does so while preserving valuable evidence of criminal wrongdoing. *See id.*; *Zimmerman*, 277 F.3d at 436.

*Leon* is well-designed for a case such as this one, where the magistrate failed to comprehend an aspect of Fourth Amendment jurisprudence requiring the synthesis of several cases, a deficiency that no police officer could have been expected to recognize, much less question. Indeed, *Leon* invites

---

admonition in *Leon*, 468 U.S. at 921: "In the ordinary case, an officer cannot be expected to question the magistrate's probable cause determination."). Two limitations to the *Leon* rule involve misconduct, either by police effectively writing their own warrants by submitting a deliberately or recklessly false affidavit, or by the magistrate abandoning his neutral role by teaming with the officers. *Id*. A third situation upholding the exclusion of evidence notwithstanding the presence of a warrant involves the use of unparticularized general warrants that purport to allow officers to search first and explain where and for what they were looking later. *United States v. $ 92,422.57*, 307 F.3d 137, 148-49 (3d Cir. 2002). The last limitation to employing *Leon's* good faith exception "applies in only those rare circumstances in which, although a neutral magistrate has found that there is probable cause, a lay officer executing the warrant could not reasonably believe that the magistrate was correct." *Zimmerman*, 277 F.3d at 440 (Alito, J., dissenting).

reviewing courts to address novel probable cause questions before turning to the good faith exception analysis:

> If the resolution of a particular Fourth Amendment question is necessary to guide future action by law enforcement officers and magistrates, nothing will prevent reviewing courts from deciding that question before turning to the good-faith issue. Indeed, it frequently will be difficult to determine whether the officers acted reasonably without resolving the Fourth Amendment issue. Even if the Fourth Amendment question is not one of broad import, reviewing courts could decide in particular cases that magistrates under their supervision need to be informed of their errors and so evaluate the officers' good faith only after finding a violation.

*Leon*, 468 U.S. at 925; *see United States v. $ 92,422.57*, 307 F.3d 137, 145 (3d Cir. 2002).

For the reasons articulated above, Howell's affidavit did not adequately support the magistrate judge's probable cause determination. However, under *Leon*, Howell was justified in relying on the invalid warrant in organizing the execution of the search.[24] No limitation to *Leon's* good faith rule applies. There is no hint of misconduct or abdication of duty on the part of Howell or the magistrate. The deficiency of particularity regarding the multiple units of the building did not appear on the face of the warrant; this deficiency was of the *Maryland v. Garrison* variety, and the majority's discussion of *Garrison* for the purposes of remand is thorough and I join in it. Regarding the last *Leon* exception recounted in the margin, this is not a circumstance in which an officer could not reasonably believe the magistrate's probable cause determination was correct. The staleness and corroboration issues either went unrecognized or were misapplied by the magistrate, the District Court, and my two colleagues in the majority. In light of these factors, it would be unrealistic to conclude that Officer Howell should have recognized, questioned, and correctly applied the nuances of staleness and anonymous tip corroboration doctrine. In my

---

[24] As explained by the majority, the *Maryland v. Garrison* issue to be addressed on remand will turn on what, if any, contraband Howell and the warrant-executing officers discovered before they realized that the building contained multiple apartments. At this point, however, I believe the officers were legally poised to enforce the warrant despite the fact that it was invalidly issued.

view, the magistrate's probable cause finding should be rejected, and the *Leon* good faith exception applied to Howell's reliance on the invalid warrant.