**PEOPLE OF THE VIRGIN ISLANDS, Plaintiff**
**v.**
**KEVIN A. TROTMAN, D.O.B. 4/16/66, KEITH E. TROTMAN,**
**D.O.B. 6/15/60, Defendants**

Criminal Nos. F78 & F81/2005

Superior Court of the Virgin Islands

Division of St. Thomas and St. John

December 14, 2006

LOFTON HOLDER, ESQ., Assistant Attorney General, V.I. Department of Justice, St. Thomas, V.I., *Attorney for the People*.

GREGORY H. HODGES, ESQ., Dudley, Topper & Feuerzeig, LLP, St. Thomas, V.I.

SAMUEL L. JOSEPH, ESQ., Assistant Territorial Public Defender, Office of the Territorial Public Defender, St. Thomas, V.I., *Attorneys for Defendants*.

KENDALL, *Judge*

## MEMORANDUM OPINION

(December 14, 2006)

THIS MATTER came on for hearing on December 4, 2006 on Defendants' Motions to Suppress and the People's Opposition thereto. Based upon the reasons set forth below, the Motion will be GRANTED.

## FACTUAL BACKGROUND

On January 20, 2005, Carl Charleswell, former Director of the Narcotics Strike Force ("NSF"), executed an affidavit for the purpose of obtaining a search warrant for Estate Mariendahl # 3J-4H. According to his affidavit, NSF had received complaints from February 10, 2004 to April 23, 2004 concerning the occurrence of violent crimes and the

distribution of drugs from two adjoining houses in the rear of Brookman Cemetery. (Aff. ¶ 6). Agent Charleswell also stated that he had received an anonymous tip that drugs were being distributed from these houses by two brothers, Keith (a.k.a. Chille) and Kevin. (Aff ¶ 7). On February 17 and 18, 2004, agents Charleswell and Walter Freeman set up surveillance in the area and allegedly observed known drug users making frequent stops at two adjoining houses. (Aff. ¶ 8).

Agent Charleswell stated that he checked with the Tax Assessor's office and discovered that the adjoining houses were located on Estate Mariendahl # 3J-4H, and owned by John Trotman (the father of Kevin and Keith). (Aff. ¶ 9). The agents later made contact with a confidential informant who told the agents that he had purchased drugs from Keith and Kevin from the adjoining houses on more than one occasion. (Aff. ¶¶ 10-11). Agent Charleswell further stated that on May 17, 2004, the informant purchased one gram of crack cocaine from Kevin Trotman while under surveillance. (Aff. ¶¶ 12-16). On December 21, 2004, the informant allegedly made a similar purchase of one gram of crack cocaine from Keith Trotman while under surveillance. (Aff. ¶¶ 18-23). The agents reported observing the informant placing something in Keith's hand, and Keith then placing something in the informant's hand. (Aff. ¶ 20).

A Search Warrant was issued on January 20, 2005, authorizing the search of "a white single family dwelling with a green roof located on Estate Mariendhal # 3J-4H" and commanding the seizure of illegal drugs, drug paraphernalia, and cash used in drug transactions.

On January 28, 2005, at approximately 6:30 a.m., law enforcement personnel executed the search warrant. The premises at 3J-4H Estate Mariendahl consist of three separate homes, none of which has a green roof. In order to secure the premises, entry teams entered the three homes at the same time. Once the entry team indicated everything was clear, dogs and their handlers entered the dwellings. If a dog alerted the handler to the presence of drugs, the search team would then enter and search for drugs.

Officer Jorge Gonzalez and his K-9 dog conducted a sniff of "dwelling number one," where Ms. Cecilia Trotman, the Defendants'

mother, resided. After fully searching her house and finding nothing,[1] they moved on to "dwelling number two," Keith Trotman's residence, and finally Kevin Trotman's residence. In the "Inventory of Property/Receipt," the agent referred to the three residences as House # 1, 2, and 3.

The officers found and seized approximately one hundred and six (106) grams of crack cocaine, point three (0.3) grams of marijuana, $502.00 in U.S. currency, and drug paraphernalia from Keith Trotman's residence. In Kevin Trotman's residence, the officers found and seized approximately seventy-seven (77) grams of crack cocaine, twenty-nine point two (29.2) grams of marijuana, $6,463.00 in U.S. currency, various surveillance equipment and drug paraphernalia.

In the People's attempt to ascertain the nature of the property located at Estate Mariendahl # 3J-4H, agents consulted with the Virgin Islands Water and Power Authority ("WAPA"), the Department of Planning and Natural Resources ("DPNR"), and the Tax Assessor's office of the Office of the Lieutenant Governor. The WAPA supervisor of customer services, Ms. Orgyll Carrillo, testified that the service contract for 3 Estate Mariendahl indicates there is only one meter on the property. The Director of Comprehensive & Coastal Zone Planning, Ms. Marjorie Hendrickson Emmanuel, testified that Estate Mariendahl # 3J-4H is zoned R-2, which is residential low density, allowing a maximum of two dwelling units. She conceded, however, that she had never seen the property, and does not know what is actually on the lot.

## ANALYSIS

The Fourth Amendment of the United States Constitution, applicable to the Virgin Islands by § 3 of the Revised Organic Act of 1954, as amended, guarantees the right of the people to be free from unreasonable searches and seizures. The warrant requirement places a neutral magistrate between the citizen and the police. *McDonald v. United States*, 335 U.S. 451, 455, 69 S. Ct. 191, 193, 93 L. Ed. 153 (1948). The Constitution requires this because "[t]he right of privacy was deemed too precious to entrust to the discretion of those whose job is the detection of

---

[1] The dog alerted his handler that there was an odor of drugs emitting from a plastic container in Ms. Trotman's kitchen. A search of the plastic container produced cigarette lighters, U.S. currency, and a bamboo box containing four packs of bamboo paper.

crime and the arrest of criminals." *Id.* at 455-56. Evidence obtained in violation of the Fourth Amendment cannot constitute proof against the victim of the search, *Wong Sun v. United States*, 371 U.S. 471, 484, 83 S. Ct. 407, 416, 9 L. Ed. 2d 441 (1963), and therefore must be suppressed at trial. *United States v. Coggins*, 986 F.2d 651, 653, 28 V.I. 241 (3d Cir. 1993).

The home has always received special protection under the Fourth Amendment. *Maryland v. Garrison*, 480 U.S. 79, 90, 107 S. Ct. 1013, 1019, 94 L. Ed. 2d 72 (1987). The protection afforded by the Fourth Amendment means little if it does not guarantee "the right of a man to retreat into his own home and there be free from unreasonable governmental intrusions." *Silverman v. United States*, 365 U.S. 505, 511, 81 S. Ct. 679, 683, 5 L. Ed. 2d 734 (1961). On a motion to suppress, the government bears the burden of showing that the search and seizure was reasonable. *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995).

## A. Particularity Requirement

█ The Fourth Amendment requires that search warrants describe "with particularity" the place to be searched, and the things to be seized. *United States v. King*, 227 F.3d 732, 750 (6th Cir. 2000). See, *e.g.*, *Groh v. Ramirez*, 540 U.S. 551, 557, 124 S. Ct. 1284, 1289, 157 L. Ed. 2d 1068 (2004) ("a warrant that fails to conform to the particularity requirement of the Fourth Amendment is unconstitutional"); *Doe v. Groody*, 361 F.3d 232, 239 (3d Cir. 2004) ("a particular description is the touchstone of a warrant").

Here, the Search Warrant described the place to the searched as "a white single family dwelling with a green roof." None of the houses that were searched had a green roof. Ms. Trotman testified that the only white single family dwelling with a green roof in their neighborhood is located immediately to the east of # 3J-4H Estate Mariendahl. Since this dwelling more accurately fits the description in the Warrant, there was a reasonable probability that the officers might mistakenly knock down the door of an innocent neighbor while executing the Warrant. Although agent Charleswell, the officer who applied for the search warrant and oversaw the operation, claimed that he knew which property the search was to be conducted on, the face of the warrant "must be sufficiently definite and clear so that the magistrate, police, and search subjects can

160

objectively ascertain its scope." *Groody*, 361 F.3d at 239. That was not the case here.

More importantly, the Warrant only authorized the search of "a" dwelling, not three separate dwellings. In *United States v. Bedford*, the Third Circuit held that "a search warrant directed against an apartment house will usually be held invalid if it fails to describe the particular apartment to be searched with sufficient definiteness to preclude a search of other units located in the building and occupied by innocent persons." 519 F.2d 650, 654-55 (3d Cir. 1975). Here, the police did in fact search the house of an innocent person—Ms. Trotman. Surely, the fact that she is the mother of the targets of the search does not give police the authority to break into her house and search it. "[T]he probable cause requirement would be rendered virtually meaningless if police could legally search several living units upon a mere showing that one of the units, not specifically identified, contained the contraband sought." *United States v. Ritter*, 416 F.3d 256, 267 n.9 (3d Cir. 2005) (citing *United States v. Busk*, 693 F.2d 28 (3d Cir. 1982)).

■ The validity of the warrant must be assessed on the basis of the information that the officers disclosed to the issuing judge. *Garrison*, 480 U.S. at 85. The discovery of facts demonstrating that the warrant was unnecessarily broad does not retroactively invalidate the warrant. *Id.* Even though the warrant was based on the mistaken belief that there was only one dwelling at Estate Mariendahl #3J-4H, it was valid when issued.

## B. Scope of the Warrant

### 1. Whether Estate Mariendahl # 3J-4H contains three separate dwelling units, or represents one continuous structure

Ms. Cecilia Trotman testified that although her sons live on the same property as her, they do not live in her house; they have lived in their own separate houses since 1975. Their residences are not connected to hers, nor do they share any walls in common. The space between their houses is wide enough to walk through, and in order for her to get from her house to either of their houses, she must go outside and use the walkway. There is no wall that connects the three houses, nor has there ever been.

The People made much of the fact that the three dwellings share the same meter, Defendants do not pay separate electricity bills, and all three dwellings share the same water source and septic tank. This, however, is not uncommon in the Virgin Islands. Many houses have separate rental units that share the same water source and electricity account, but they are still separate dwellings.

After hearing the testimony and viewing the evidence, this Court is satisfied that the premises at Estate Mariendahl # 3J-4H contain three separate and distinct dwelling units.

## 2. Search Warrant vs. Affidavit

In the affidavit supporting the search warrant, Agent Charleswell refers to the premises as "two (2) adjoining houses," but later refers to it as "a white single family dwelling with a green roof." Although the Petition asked for a search warrant for the "premises designed [sic] at Estate Mariendhal # 3J-4H," the resulting warrant restricted the authorized search to "a white single family dwelling with a green roof located on Estate Mariendhal # 3J-4H." The scope of the authorized search is determined by the language in the search warrant, not by the affidavit which preceded it. See, e.g., *Groody*, 361 F.3d at 241 ("[t]he warrant provides the license to search, not the affidavit"). In *Groody*, the police sought permission to search all of the occupants of a house, but the warrant only authorized the search of John Doe. *Id.* at 236. The Third Circuit found that this was a significant "difference as to scope," *Id.* at 240, and the police's search of the other occupants was not authorized under the warrant. *Id.* at 241. Since the warrant was not ambiguous or contradictory on its face, it was inappropriate to look to a separate affidavit to "clarify" the warrant. *Id.* at 240. "The mere fact that the Magistrate issued a warrant does not necessarily establish that he agreed that the scope of the search should be as broad as the affiant's request." *Id.* at 242.

Agent Charleswell testified that upon issuance of the search warrant, he asked Judge Swan what search was authorized under the warrant, and the Judge told him that the warrant authorized a search of the entire property located at Estate Mariendahl # 3J-4H. We find it implausible, however, that the Judge would restrict the search to "a white single family dwelling" in the actual warrant when he meant to authorize a search of the entire premises. Based upon the language of the warrant,

the officers were authorized to search "a white single family dwelling," and nothing more.

## C. Execution of Warrant

■ If the officers' execution of the warrant exceeded the scope of the warrant, the evidence recovered from the illegal search will be suppressed, even though the search warrant was validly issued. See, *e.g.*, *King*, 227 F.3d at 751. ("a valid search warrant can turn into an invalid general search if officers flagrantly disregard the limitations of the warrant"). In *Garrison*, officers executed a search of the third floor of an apartment building pursuant to a warrant. 480 U.S. at 80. When they realized that the third floor consisted of two, not one, apartments, they immediately discontinued their search. The Court held that the officers acted properly. "[T]hey were required to discontinue the search of respondent's apartment as soon as they discovered that there were two separate units on the third floor and therefore were put on notice of the risk that they might be in a unit erroneously included within the terms of the warrant." *Id.* at 87.

In *Ritter*, a search warrant was issued for a house, but when the officers arrived to conduct their search, they realized that the property's main structure was not a single dwelling, but rather consisted of at least four separate apartments. 416 F.3d at 260. The officers searched all of the apartments and seized contraband. The Third Circuit held that the search warrant was valid, but the officers' execution of the warrant required that the evidence be suppressed. "[O]nce the officers discovered that the house had multiple dwelling units, they could no longer rely on the warrant to justify their search of the building." *Id.* at 267.

■ The facts in *Ritter* are similar to the facts in this case. The officers arrived on the premises armed with a search warrant, and only upon arrival did they realize that there was more than one dwelling on the property. Just as the Court held in *Ritter*, the officers were required to discontinue their search once they realized that there was more than one dwelling unit involved. "It is settled that where ... a structure is divided into more than one unit, probable cause must exist for each unit." *United States v. Gonzalez*, 697 F.2d 155, 156 (6th Cir. 1983).

163

## D. Good Faith Exception

 The Supreme Court has held that even when a search warrant was invalid, the evidence found in the search should not be suppressed when the officers involved reasonably relied on the search warrant. *United States v. Leon*, 468 U.S. 897, 913 n.9, 104 S. Ct. 3405, 3415, 82 L. Ed. 2d 677 (1984). The Court has "recognized the need to allow some latitude for honest mistakes that are made by officers in the dangerous and difficult process of making arrests and executing search warrants." *Garrison*, 480 U.S. at 87.

 The People made a good-faith attempt to ascertain the nature of the property located at Estate Mariendahl # 3J-4H. The NSF agents consulted with WAPA and learned that there was one meter for the property. The Tax Assessor's office told the agents that there was only one structure on the property. DPNR informed the agents that the property was zoned R-2, which allowed a maximum of two dwelling units. Although the People made a good-faith effort to identify the property, upon arriving there and seeing separate dwelling units, the officers were required to cease the search and get a search warrant for the other units. Their failure to do so was a flagrant disregard of the limitations of the warrant.

Agent Charleswell testified that he believed all of the houses were connected, and that Ms. Trotman's house shared common walls with both Keith and Kevin's houses. Agent Freeman also testified that he thought the property was a single family house with two adjoining structures, and he did not realize that the structures were not connected until after the warrant was executed.

The chief building inspector of the DPNR Permits Division, Mr. Newton Peters, testified that he had personally inspected the property at Estate Mariendahl # 3J-4H, and it was "immediately apparent" upon entering the premises that there were three separate structures on the property. He described this fact as so obvious that "even a blind man could see [it]." Each structure had its own entrance, and was detached from the other two structures. The Court finds Mr. Peters's testimony more credible than that of the agents.

Even if it was not immediately apparent to the agents that there were three unattached structures on the property, agents Charleswell and Freeman admitted that they had to walk out of Ms. Trotman's house and around it to get to Keith's house, and the same for Kevin's house. Agent

Freeman admitted that he had to walk through a small gate to get to Keith's residence.

In *King,* the officer had a warrant to search the first floor of a two-unit house; he came upon a hallway where he found stairs that led to the basement. Relying on the warrant, the officer proceeded down the stairs and searched the basement. 227 F.3d at 737. The court found that the officer's decision to proceed without a warrant for the basement was flagrant and unreasonable, and the evidence seized from the basement was suppressed. *Id.* at 752.

Here, the officers had to walk outside of each dwelling to reach the next. There were no inner doors or stairways that provided access to the adjoining dwellings. Once the officers were forced to go outside and through a separate door, they were on notice that other dwelling units were involved, and they should have known that other warrants were needed.

## CONCLUSION

For all of the foregoing reasons, the Court finds that the officers exceeded the scope of the search warrant, the good faith exception does not apply, and the execution of the warrant was unreasonable. Accordingly, Defendant's "Motion to Suppress" is GRANTED.